THE STATE ex rel. J. S. HOPKINS et al., Appellants, v. EXCELSIOR POWDER MANUFACTURING COMPANY.

Division Two, June 23, 1914.

1. **NUISANCE: Negligence: Powder Factory and Magazine.** A powder magazine, as to all property and residents in such proximity to it that they are subject to danger from its explosion, is a nuisance regardless of the question as to negligence in the manner of keeping it.

2. **PUBLIC NUISANCE: Powder Factory: Licensed and Lawful Business.** The facts that defendant powder company is licensed to do business in the State, that it is conducting a lawful business, and that its products are useful and necessary for the public welfare and defense, do not prevent its factory and magazine from being a nuisance if so situated as to be dangerous to persons and property.

3. ———: ———: **Dangerous Area: Evidence.** A powder magazine is a public nuisance when so situated as to be dan-

gerous to persons and property over an area which includes public roads, two villages with postoffices, a railroad over which run numerous trains, and a public schoolhouse—an entire community, in short.

4. ———: ———: **Suit to Abate: Prosecuted by State: Legal Services Provided by Relators.** Where the petition in a suit to abate a public nuisance shows that the suit was brought by the Attorney-General, and the evidence shows that he satisfied himself as to the propriety of the suit, signed the petition which had been prepared by counsel for the relators, and authorized it to be filed, the suit is prosecuted by the State. The fact that the legal services in the trial court and on appeal were rendered by counsel employed and paid by the relators does not affect the question.

5. ———: ———: ———: **Injunction: Evidence: Damage to Defendant.** Where it is shown that large quantities of powder were kept in defendant's powder factory and magazine, that an explosion of the "glaze" damaged a passenger train and injured the people in it; that the effect of the explosion upon a neighboring schoolhouse was such as would have severely injured the pupils if it had occurred during school hours; that large metal shafts were thrown great distances across a county highway and over the railroad, and a plate glass window was broken in a village four miles away; that windows, doors, plaster, flues and roofs were damaged within a radius of two or three miles, and that valuable real estate within that radius had been greatly lessened in value, an injunction abating the factory and magazine as a public nuisance is granted, although the defendant's loss in business and equipment will be great— leave being given to the defendant to make a showing, if it sees fit, as to whether it can operate its mill or maintain powder or dynamite magazines on its grounds in such a way that the amount of explosive in any one place at one time will not be dangerous to persons or property outside of defendant's grounds and so that the explosive in one place will not be in danger of explosion from that in any other place, the decree to be modified upon such showing.

6. ———: ———: ———: **Laches.** Where in an action by the State upon relation to abate a powder factory as a public nuisance there is no showing that the community knew for what purpose the plant was built, and it appears that after the first damaging explosion occurred in November, 1908, the relators in the following January applied to the Attorney-General with their petition, and that petition was filed within a week and before the plant resumed operations, it is *held* that the suit is not barred by laches. Moreover, laches will

not be imputed to the State, and it has been held that as against the State one cannot claim a right by prescription to maintain a public nuisance.

Appeal from Jackson Circuit Court.—*Hon. Thomas J. Seehorn,* Judge.

REVERSED AND REMANDED (*with directions*).

*Elliott W. Major,* Attorney-General, *J. McD. Trimble, John A. Eaton* and *Dudley W. Eaton* for appellant.

(1) A powder mill, such as the defendant has, with its immense magazine for the storage of powder, and its dynamite magazine, located as this is near a trunk line railroad, near public highways, near a public school, and in the midst of a populous community with its hotels, churches, stores, postoffices, shops and private residences, is a public nuisance. Joyce, Law of Nuisances, secs. 384, 385, 99; Garrett on Nuisances (3 Ed.), p. 43; Wood on Nuisances (3 Ed.), p. 6; Wilson v. Powder Mfg. Co., 40 W. Va. 413; Cheatem v. Shearon, 1 Swan (Tenn.), 213, 55 Am. Dec. 734; Cumming v. Stevenson, 76 Tex. 644; Kleebauer v. Western Fuse, etc., Co., 69 Pac. 246; Appeal of Wier, 74 Pa. St. 230; Heeg v. Licht, 84 N. Y. 579; Rhodes v. Dunbar, 57 Pa. St. 274, 98 Am. Dec. 221; Hackney v. State, 8 Ind. 495; Burlington v. Stockwell, 5 Kan. App. 569; Kissel v. Lewis, 156 Ind. 233; Moses v. State, 58 Ind. 185; Ross v. Butler, 19 N. J. Eq. 294; Glycerine Co. v. Woolen Mfg. Co., 60 Ohio St. 560; Schnitzer v. Powder Mfg. Co., 160 S. W. 282. (2) It is no answer to the charge of maintaining a nuisance that the business was carried on in a convenient place, when it is in fact a nuisance. Joyce, Law of Nuisances, sec. 95; Powder Co. v. Tearney, 19 Am. St. 34; Fertilizer Co. v. Spangler, 86 Md. 562. (3) The trial court erred in undertaking to "balance conveniences" or estimate

the difference between the injuries which the citizens of Missouri had sustained and the loss which the defendant would sustain from having its powder plant declared a public nuisance. No one has the right to create a nuisance by erecting such dangerous works, and then say he has expended large sums of money in so doing and that the neighboring property is of little value, or that he has erected such a big and expensive nuisance that it will have to be suffered. Joyce, Law of Nuisances, sec. 483; 21 Am. & Eng. Ency. Law (2 Ed.), 689; United States v. Luce, 141 Fed. 416; Fertilizer Co. v. Malone, 25 Am. St. 595; Evans v. Fertilizer Co., 160 Pa. St. 209; Wente v. Fuel Co., 232 Ill. 526; Seacord v. People, 121 Ill. 623; State v. Kaster, 35 Iowa, 221; Sullivan v. Steel Co., 57 Atl. 1065; Evans v. Fertilizing Co., 28 Atl. 709; Preserve Co. v. Beeman, 60 S. W. 849; Hough's Appeal, 48 Am. Rep. 193; 29 Cyc. 1161. (4) It is a uniform rule that a public nuisance may be abated at the suit of the Attorney-General or the County Attorney, and such suit may be prosecuted either without or upon the relation of persons especially injured by the nuisance. Wood on Nuisances, p. 938, secs. 819-820; State ex rel. v. Vandalia, 119 Mo. App. 406; State ex rel. v. Lamb, 237 Mo. 437; Smith v. McDonnell, 35 N. E. 141; People v. Lumber Co., 48 Pa. 374.

*Kinealy & Kinealy* and *E. Wright Taylor* for respondent.

(1) Defendant's plant, being a lawful manufacturing establishment for the operation of which it has been duly licensed by the State, is not and cannot be a nuisance *per se*. Realty & Imp. Co. v. Crockett, 158 Mo. App. 581; Loth v. Theatre Co., 197 Mo. 355; Randle v. Railroad, 65 Mo. 333; 29 Cyc. 1153, 1159-60; Joyce on Nuisances, sec. 16, p. 26; Payne v. Railway,

112 Mo. 17. And the mere fact that the plant is a powder factory does not make it an exception to the rule. Kinney v. Koopman, 116 Ala. 310; Dumesnil v. Dupont, 18 B. Mon. 809. (2) The plaintiffs wholly failed to make out a case of public nuisance against defendant's manufacturing plant. To prove that it is such it would be necessary for the evidence to show that by reason of its location and character it violated the rights of the public at large by subjecting them to a danger of such kind that: There was a reasonable anticipation of injury. Webb's Pollock on Torts, p. 45; Lawless v. Laclede L. Co., 72 Mo. App. 683; Dumesnil v. Dupont, 18 B. Mon. 800; Dilworth's Appeal, 91 Pa. St. 247; Whitfield v. Carrollton, 50 Mo. App. 104; Harper v. Oil Co., 78 Mo. App. 345; Dock Co. v. Libby, 45 N. Y. 449; United States v. Reeves, 38 Fed. 404; United States v. Wilson, 28 Fed. 707; Strode v. Box Co., 124 Mo. App. 520; Meifert v. Sand Co., 124 Mo. App. 496; Cleveland v. Gas Light Co., 20 N. J. Eq. 207. And that the injury to be apprehended was real and substantial in charatcer, and such as to effect, physically, men of ordinary sensibilities and simple tastes. 29 Cyc. 1154, 1190-1; Joyce on Nuisances, sec. 88, p. 136; 1 Wood on Nuisances, pp. 4, 104; Kirchgraber v. Lloyd, 59 Mo. App. 62; Harper v. Oil Co., 78 Mo. App. 345. (3) The one explosion, that of the glaze, which exhibited an effect outside of the defendant's premises, was not sufficient to show that danger outside of the premises was to be anticipated. Beasley v. Transfer Co., 148 Mo. 420; Strode v. Box Co., 124 Mo. App. 523. (4) If it were the fact that defendant's plant had a tendency to decrease the value of surrounding property that would not be sufficient to constitute it a nuisance. 1 Spelling on Extra. Rem., sec. 396, p. 350; Parker v. Lake, C. & W. Co., 2 Black. 545. (5) Even where a nuisance is shown to exist a court of equity will not interfere by injunction unless: The damage or injury is actual, certain and substantial.

29 Cyc. 1226; Joyce on Nuisances, secs. 21, 22; 1 High on Injunctions, sec. 774, pp. 738-9; 2 Joyce on Injunctions, sec. 1079, p. 1558, note 193; Canal Co. v. Canal Co., 177 U. S. 296. And is continuous or constantly recurring. 1 Spelling, Extra. Rem., sec. 377, p. 335; Scheurich v. Light Co., 109 Mo. App. 424;. Akers v. March, 19 App. D. C. 43; Hagge v. Railway, 104 Fed. 391; Tuttle v. Church, 53 Fed. 422. And is irreparable in character so that it cannot be compensated for by damages. 29 Cyc. 1223-4; 1 High on Injunctions, secs. 740, 817; Atty. Gen. v. Gas Con. Co., 3 Deg. M. & G. 320; Joyce on Nuisances, sec. 415, p. 592; Mayor v. Canal Co., 12 Pet. (U. S.) 98; Wood v. Sutcliffe, 8 Eng. Law & Eq. 217; Welton v. Martin, 7 Mo. 310; Bailey v. Culver, 84 Mo. 540. And the evidence makes out a strong case of urgent or pressing necessity, which is clear, manifest and strongly established. 29 Cyc. 1221, 1225; 2 Story's Eq. Jur., p. 296, sec. 924a; Joyce on Nuisances, sec. 88, p. 136; Railroad v. Ward, 67 U. S. 485; Parker v. Lake C. & W. Co., 2 Black. 545; Missouri v. Illinois, 180 U. S. 249; Sellers v. Parvis & Williams Co., 30 Fed. 164; Arnold v. Klepper, 24 Mo. 277; Tanner v. Dallbrunn, 77 Mo. App. 262; Atty. Gen. v. Gas Con. Co., 3 Deg. M. & G. 325. (6) An injunction is not a writ of right but is granted or refused in the discretion of the court in view of all the facts and circumstances shown by the evidence and taking into consideration every phase of the case and including the relative advantages and disadvantages to the parties concerned. And the rules applicable to public and private nuisances are the same. 5 Pomeroy's Eq. Jur., sec. 542; Atty. Gen. v. Gas Con. Co., 3 Deg. M. & G. 320; 2 Story, Eq. Jur., sec. 959a; Good v. Fire Brick Co., 224 Pa. St. 503; 1 High on Inj., secs. 740, 776; Equitable L. Ins. Co. v. Brown, 213 U. S. 25; 2 Joyce on Injunctions, sec. 1067; Safe Dep. Bnk. v. Kenneth Est., 101 Mo. App. 395; Bailey v. Culver, 84 Mo. 540; Tanner v. Lindell Ry. Co., 180 Mo. 18;

Baker v. McDaniel, 178 Mo. 474. (7) While this court must necessarily pass upon the evidence for itself yet deference will be paid to the findings of the chancellor, especially when backed by the opinion of four of his associates, all familiar with the locality and the persons concerned. Ancell v. Bridge Co., 223 Mo. 231; Lumber Co. v. Crommer, 202 Mo. 521; Danforth v. Foster, 158 Mo. App. 99; Smith v. Sedalia, 152 Mo. 299. (8) The evidence shows that this suit is not prosecuted by the State of Missouri or its Attorney-General but by individuals in the name of the State. The Attorney-General has no power to permit this to be done. State ex rel. v. Vandalia, 119 Mo. App. 419; 2 Joyce on Inj., sec. 1079, p. 1557; New Hampshire v. Louisiana, 108 U. S. 76; Poindexter v. Greenhow, 114 U. S. 270. (9) Even had there been anything of substance in plaintiffs' complaint their laches would have barred them of any relief. New York v. Pine, 185 U. S. 98; Galliher v. Caldwell, 145 U. S. 368; Stevenson v. Smith, 189 Mo. 466; Dexter v. McDonald, 196 Mo. 403; Pike v. Martindale, 91 Mo. 268.

ROY, C.—This is a proceeding to abate the defendant's powder factory, powder magazine and dynamite magazine as a public nuisance, by injunction. The trial court found for the defendant and dismissed the bill. The petition is broad enough to cover any theory of the case shown by the evidence and prays that defendant be enjoined ''from manufacturing or storing any powder, dynamite or other high explosives in any of its said buildings or on its said lands, or any part thereof, or on any other lands in the neighborhood in which the same are situated, and the plaintiff further prays for any and all other orders, judgments, decrees and relief to which in justice and in equity it may be deemed to be entitled, and for the costs of this suit.''

The answer states that defendant was on August 3, 1905, licensed as a foreign corporation to do business in this State as a manufacturer of, and dealer in, blasting and sporting powders and high explosives, and that such license is still in effect.

That the location of defendant's plant was selected by it as the best that could be had in the western part of Missouri, the eastern part of Kansas and the northwestern part of Arkansas. That the industries of that territory are such as to require a large amount of blasting powder, the manufacture of which is alleged to be necessary for the public welfare and defense. That there is no other blasting powder factory in Missouri. That the nearest railroad had constructed switches to defendant's plant for commercial purposes; and that defendant's buildings are at such distances from each other as to prevent one from being exploded by another, and that such buildings are located around the sides of a hill covered with timber, and that the danger of explosion in any of the buildings is exceedingly slight. That there is no danger from explosion except on defendant's ground, and that it keeps on hand only so much powder and dynamite as is necessary to supply the trade. That defendant manufactures only black blasting powder, which is the least dangerous explosive manufactured. That it employs a large number of men, and conducts its plant with care and caution, in accordance with the most approved methods. That the defendant's plant is not a nuisance or source of danger, but is a lawful work under said license. That defendant's plant represents an outlay of over a hundred thousand dollars, and that defendant has built up a business worth over $250,000, all of which would be destroyed by an injunction, thereby depriving it of its property without due process of law, and would take or damage said property without compensation, contrary to the State and National Constitutions, specifying the sections. It alleges that the

suit is not prosecuted in the name of the real parties in interest, and states that those real parties are the relators named in the petition. The reply denied "each and every allegation of new and affirmative matter set up and contained in the answer."

Mr. Gorman, president of the defendant company, after investigating the question as to freight rates, the demand for explosives and a suitable site, selected fifty-five acres belonging to Peter Johnson, one of the relators, and his brother, as the best location for such a plant; and, through Mr. Sloan, a real estate man, purchased it at $100 an acre, sometime in the summer of 1904. Mr. Johnson testified that at the time he sold the land he asked the agent who came to purchase it what it was being bought for and that he received the answer, "That is none of your business as long as you get the money." Mr. Sloan was a witness for defendant and did not deny the statement. Mr. Johnson still owns about a hundred acres adjoining the railroad west of defendant's land. The land thus purchased is south of Kansas City, about two miles from the terminus of the street car tracks. It is half a mile long north and south, bounded west by the "Frisco" railroad.

On September 6, 1904, the defendant contracted with the railroad company for the construction of suitable switch tracks on defendant's grounds, and agreed to make certain stated payments to reimburse the railroad company for the expense of such construction. That contract contained the following: "Provided, however, that in case the Powder Company is prevented, by fire, accident, or injunction, from making shipments to and from its said plant over said tracks at any time within said period of two years from the time of commencement of operation of said powder plant, then said period during which said refund is to be made shall be extended for a term equal to the time

said Powder Company is prevented from making shipments as aforesaid.''

The mills and magazines of the defendant by their positions form a line something like the letter ''S'' with the top to the north. Beginning at the northeast there is a row of four ''wheel mills'' running west by south about two hundred feet apart. In them the materials for making powder are mixed and ground together. Three hundred feet south by east of the most westerly wheel mill is the press, where the product of the wheel mills is pressed into cakes. Three hundred feet south by west of the press is the ''corning mill'' where the cakes are ground into powder. About the same distance south by east of the corning mill is the glaze mill or ''glaze,'' where the powder is finished. About three hundred feet east by south of the glaze is the packing house where the powder is packed in twenty-five pound metal cans. The same distance south by west of the packing house is the powder magazine, where it is stored by the side of the railroad switch track ready for shipment. Four hundred feet southwest of the powder magazine, and a hundred and fifty feet east of the railroad, is the dynamite magazine. The offices, powder house, warehouses and other buildings used in connection with them are in the northwest corner of defendant's land. A tramway connects all those buildings except the dynamite magazine. All the product of the corning mill during the day is placed in cylinders or barrels in the glaze. Those barrels turn on solid metal shafts four and a half inches in diameter and eight or ten feet long. They turn from six o'clock p. m. until as late as six, ten or eleven o'clock the next morning. The friction thus caused polishes the powder and produces heat which dries it.

The Kansas City Southern Railroad Company runs its trains over the Frisco track, and altogether there are about fifteen regular trains over it a day,

eight of them being passenger trains. A public road known as the Santa Fe Trail, not extensively traveled, nor in very good repair, touches the northwest corner of defendant's land, being the southern entrance and exit to and from Holmes Park, a village a little over a quarter of a mile from defendant's glaze. Prior to the opening of defendant's plant, Holmes Park contained about six residences, a public schoolhouse, a postoffice and a "flag station" on the railroad. Since then the number of residences has about doubled, and there is a station agent, a boarding house and blacksmith shop. Over a mile and a quarter southeast of defendant's glaze is the village of Hickman's Mills, with a store, postoffice, church and several residences. A rock road runs east and west a quarter of a mile north of defendant's land. The evidence shows that the foot of the runway at the glaze is thirty-six and a half feet above the railroad which is four hundred and fifty feet distant. And from the foot of that runway to the "top of the hill" eastward is forty-three and a.half feet. The photographs in evidence show an undulating landscape on and around defendant's land, but do not show precipitous hills or bluffs. There is considerable forest growth at intervals on and around defendant's land. The land around the powder works is used for farming, pasturage and dairying, the farms averaging ninety acres or more in size. The wheel mills, press, glaze, corning mill, packing house and powder magazine are of cheap balloon construction, made of light framing with iron siding and roofs. But the glaze and wheel mills have expensive concrete floors, and the machinery of the glaze is expensize.

The defendant began manufacturing in May, 1905. The evidence is silent on the subject as to what anyone except the defendant knew of the purpose of the defendant to manufacture or deal in explosives prior to the beginning of manufacturing. Prior to Novem-

ber 12, 1908, there were six explosions of wheel mills and one of the corning mill. Owing to the comparatively small amount of powder in those mills at any one time, and to its loose, unconfined condition, those explosions did no substantial damage outside of defendant's grounds. On the last-mentioned date, about six o'clock a. m., just as a passenger train was going by defendant's grounds, the glaze exploded. It then contained eight barrels or cylinders, each containing about a hundred kegs of powder, in all twenty thousand pounds. The damage done to the train and passengers was shown by the testimony of the conductor as follows:

"Some of our lights were all blown out—the window lights—and I tried to get outside by way of the door, but the door was twisted, so I couldn't open it then. Then I crawled through the vestibule window and walked along the side of the train to the head coach, and then I went in and lit my lantern. We had no lantern lights lit at that time, or any other lights in the train. Then I lit my light and walked through the train. I found the passengers cut with fine glass, more or less; all of them, cut with fine glass. I walked right back through the Pullman, and found that a berth was blown down.

"Q. (Interrupting.) What do you mean by that —an upper berth in the Pullman? A. Yes, sir; it was blown loose from the wall, and fell on some of the passengers. One lady passenger was pinned down and couldn't get loose. That was about all the serious damage. Then I walked to the rear end, and about all the damage was the glass blown out of the windows, and this Pullman blown down; but there was no serious damage there. Then I walked back to the head part of the train and found the passengers more or less cut with glass, women and children—but there were none of them, I thought at the time, seriously hurt. There was one lady who had glass in her eye, I never could tell

how much; and our porter was cut and also one of the brakeman. I was hurt in the stomach myself. I wasn't blown up, and the force came down."

A plate glass was broken in a store window at Grandview, four miles away. Some of those large metal shafts were thrown across the road and across the railroad onto an adjoining farm. One of them was thrown more than a quarter of a mile. Fragments of material, metal and wood were thrown on adjoining farms, a large piece of iron falling on a house seventeen hundred feet away, breaking two rafters. Another fell a quarter of a mile still further away. The explosion cracked a cistern at a house in Hickman's Mills. It broke windows, doors, plastering, flues, being more or less violent according to distance, within a radius of several miles. The windows in the school house at Holmes Park were shattered in such a way as would have been dangerous to the pupils had school been in session, and the flue was shattered so that it was rebuilt.

The defendant put in evidence a list of thirty-eight persons to whom it paid small sums for damages caused by the explosion, amounting to $348.07. Mr. L. W. Holmes, a merchant of Holmes Park, was a witness for the defendant. He received $34.59 damages to windows and plastering in his store and residence. Mr. Harrington, the blacksmith of Holmes Park, was also a witness for defendant. He received $15.85 for damages. Mr. G. W. Kemper, another such witness, got $14.35 for damages to a house in Holmes Park.

By the explosion of the glaze the corning mill and packhouse were burned; and the press and powder magazine were damaged, the roof of the latter falling upon the kegs of powder. The list of persons who were paid damages contained the names of persons living in all directions from the powder works.

The evidence tends strongly to show that the attendance at the Holmes Park school appreciably di-

minished after the resumption of the powder mill in February after the explosion.

The average amount on hand daily in the powder magazine during the year 1908 was 16,517 kegs. In 1909 it was 11,264 kegs. The dynamite magazine was built of double walls of boards, fifteen inches apart, filled between with cinders, and the dynamite was stored in it a car load of 20,000 pounds at a time.

About the time of that explosion the defendant purchased forty acres of land adjoining the north half of its other tract on the east for $6000. After the explosion the number of barrels in the glaze was reduced from eight to six, thus reducing its capacity from 20,000 to 15,000 pounds. Mr. Olin, a powder expert, witness for defendant, testified that the comparative force of the explosion of different quantities of powder is in proportion to the square roots of the quantities.

Mr. Sloan, the real estate man of Kansas City who acted for the defendant in purchasing the land in 1904 for the plant, testified on cross-examination that in the last few years lands south of Kansas City extending beyond defendant's plant had increased in value rapidly, the growth of the city and street car extension being in that direction. He further testified as follows:

"Q. In your judgment as a real estate man, Mr. Sloan, would you consider property in that neighborhood and vicinity as being desirable as a place for investors to build rural homes? A. In my judgment, a powder mill would not be an attraction.

"Q. It would be a detraction rather than an attraction? A. Close to it, it would.

"Q. Well, take within a distance of two miles. What would you say about that? A. Well, I would be willing myself to go within two miles of the powder mill without any apprehension of fear.

"Q. Suppose it is in evidence here that this explosion affected property two miles, and three miles, and four miles, and four and one-half miles from this powder mill. How would you answer my question then about it affecting property within two miles? A. Well, I would answer it then this way: If you can show that it affected property twenty miles, or fifty miles, then it wouldn't be desirable. If you show that the explosion a hundred miles, then it wouldn't be desirable.

"Q. It would affect its market value, wouldn't it? A. Certainly."

The opinion of the witnesses as to the value of the lands around the powder mill, on the basis of what it would be without the presence of the powder plant, placed the land at from $150 to $400 an acre, varying according to the character of the land and the opinion of the witnesses. During the cross-examination of Mr. T. T. Moore, a witness for defendant, the following occurred: "Q. What do you say as to the effect of the location of this powder mill there—as to the property in that vicinity? A. It certainly damaged it. Q. How does it affect its sale or market value? A. I should judge it affected it, according to the proximity to the powder mill. Q. What is its effect on the property situated nearest to the powder mill? How does it affect that, as compared with those farthest away? A. I think it almost destroyed the value of those right close to it." The evidence shows that real estate sales, except in Holmes Park, have practically ceased in that vicinity.

The trial judge, in a colloquy at the time of making his decision, said, "Well, the evidence shows that the property around there would be doubled in value if this industry was destroyed."

Three of defendant's witnesses, expert powder men, including Mr. Gorman, the president of the defendant company, testified that powder is dangerous.

One of them, Mr. Olin, testified as follows: "Q. Do you know of any way to operate a powder mill without the hazard of explosion? A. No, sir. Q. It is incident to, and belongs to the powder business—doesn't it? A. It is necessarily a feature in the process of manufacture, so far as determined yet by anybody. Q. I believe you stated that ninety-nine per cent of the accidents by powder mill explosions were unavoidable and could not be foreseen? A. I should have qualified that, by my own experience."

During the cross-examination of Mr. Gorman, the following occurred: "Q. Because powder is dangerous—you admit that, do you? A. Yes, I admit that, too. Q. When is it the most dangerous—at the time the mill is running or not? A. I don't know any particular time." He also testified that forty per cent grade dynamite is twenty-eight times as powerful as blasting powder.

The defendant put in evidence the following statement of its business:

### INVESTMENT.

| | | |
|---|---|---|
| Duplicate machine and supplies | $ 1,680.89 | |
| Machinery, building, etc. | 119,413.72 | |
| Horses and vehicles | 858.75 | |
| Land | 11,500.00 | |
| | | |
| Plant (as per schedule above) | | $133,453.36 |
| Betterments (repairs) | | 22,789.51 |
| Advertising and incidental expense (salaries, rent, stationery, etc.) | | 55,351.82 |
| Discount on bank loans, other interest items, reconstruction amounts, etc. | | 27,333.31 |
| Interest on original investment, $133,453.36, four years at six per cent per annum | | 32,028.80 |
| Good will | | 275,000.00 |
| | | |
| | | $545,956.80 |

Mr. Gorman testified that the forced removal of the plant would entirely wipe out the good will of defendant's business.

Defendant put in evidence a statement of the amounts annually expended by it in Kansas City as follows:

MONEY EXPENDED IN KANSAS CITY.

| | |
|---|---:|
| Payroll per annum .....................................$ | 30,000.00 |
| Charcoal .......................................... | 7,000.00 |
| Coal .............................................. | 7,000,00 |
| Kegs .............................................. | 27,000.00 |
| Small parts machinery .............................. | 5,000.00 |
| Rent, incidentals, stationery, etc. ..................... | 5,000.00 |
| Inbound freight per annum .......................... | 30,000.00 |
| | $111,000.00 |

Also a statement of its contract liabilities for future supplies as follows:

CONTRACT LIABILITIES.

| | |
|---|---:|
| One hundred and fifty tons per month of sodium nitrate contracted for last six months, 1909, 900 tons, 2,016,000 lbs., at $2.50 per hundred ........................$ | 50,400.00 |
| Fifty tons per month of sodium nitrate contracted for year 1910, 600 tons, 1,344,000 lbs., at $2.50 per 100.... | 33,600.00 |
| One hundred and fifty tons sulphur contracted for last six months 1909, 336,000 lbs., at $1.50 per 100...... | 5,040.00 |
| Seven hundred and fifty tons charcoal contracted for to be delivered between July, 1909, and December, 1910, 1,500,000 lbs., at 60 cents per hundred ........... | 9,000.00 |
| Two hundred and fifty thousand kegs contracted for to be delivered between July, 1909, and May, 1910........ | 27,500.00 |
| | $125,540.00 |

The evidence for the defendant showed that the closing of its business at the present location would result in the loss of seventy-five or eighty per cent of the value of its machinery and apparatus.

The deposition of Elliott W. Major, who was Attorney-General at the date of the institution of the suit, was read, showing that the original petition in the case was presented to him by Mr. J. McD. Trimble, counsel for the relators, on January 15 or 16, 1909, also some affidavits and a plat showing facts bearing

on the propriety of such suit. That he took the matter under advisement for several days, then signed the petition and caused it to be filed. The legal services for plaintiff in the trial court and in this court have been rendered by counsel employed by relators.

I. A powder magazine, as to all property and residents in such proximity to it that they are subject to danger from its explosion, is a nuisance regardless of the question as to negligence in the manner of keeping it.

*Nuisance: Powder Factory: Negligence.*

An anonymous case was decided by Chief Justice HOLT in the King's Bench, in the year 1700, *nisi prius,* reported in 12 Mod. 342. The defendant was indicted for a nuisance for keeping *several barrels* of gunpowder in Brentford Town, sometimes two days, sometimes a week, till he could conveniently send them to London. *Held,* that, though gunpowder be a necessary thing, and for defense of the kingdom, yet if he kept it in such a place as it is dangerous to the inhabitants or passengers, it will be a nuisance. That case does not require that there shall be any negligence in keeping the powder, nor does it make any requirement as to how many passengers or inhabitants shall be subject to the danger.

In Rex v. Taylor, 2 Str. 1167, the Court of King's Bench, in 1742, *granted an information* against the defendant as for a nuisance, on affidavits of his keeping great quantities of gunpowder, to the endangering the church and houses where he lived.

Roger Williams was convicted of keeping four hundred barrels of gunpowder near the town of Bradford. [Rex v. Williams, E. 12 W.]

In People v. Sands, 1 Johns. (N. Y.) 78, decided in 1806, the defendant was indicted for keeping fifty barrels of gunpowder at Brooklyn, near the dwelling houses of divers citizens and near a certain public street. Chief Justice KENT held that it was necessary to show negligence in the manner of keeping the pow-

der; and in speaking of the anonymous case, supra, said: "This case, as far as it is any authority, goes in confirmation of the principle, that the time, place and manner are all important and essential in determining whether a powder-house amounts to a nuisance; but considering the loose manner in which this case is reported, and the book in which it is found, it is not entitled to much, if any, consideration. The case of the King v. Taylor (Str. 1167) was also cited, but it throws no light on the question; it states merely the fact that the Court of King's Bench granted an information against the defendant, as for a nuisance, for keeping great quantities of gunpowder to the endangering the church and houses where he lived." He concluded his opinion by saying: "The fears of mankind will not alone create a nuisance, without the existence of real danger." In 1844, Myers v. Malcolm, 6 Hill (N. Y.), 292, was decided. About six hundred pounds of powder were kept in the village of Syracuse. The language of the opinion in that case is not clear as to whether negligence was necessary.

In 1816, Crowder v. Tinkler, 19 Ves. 616, was decided in the English Court of Chancery. Plaintiff conducted paper mills and defendants were operating a powder mill. Both mills had existed for fifty-one years. At first defendants' corning mill was two hundred and nine yards from the paper mills. Thirty-seven years before the suit was brought, the corning mill exploded, and was rebuilt at the distance of four hundred yards from the paper mills. Just before the suit defendants proceeded to rebuild it on the old site. The court said: "It is conceived that at common law the erection of a corning house of this sort, if attended with danger to the public, would not be a nuisance. To that I do not agree as, though gunpowder is an article of recent origin, the principle of law is, that any subject of modern discovery cannot be used in such a manner as to constitute nuisance merely on the

ground that the materials are of modern discovery. The instance has occurred of a conviction upon a prosecution for employing a reservoir of gas in a place where an explosion might be dangerous to the King's subjects or their property."

Cheatham v. Sheardon, 1 Swan (Tenn.), 213, decided in 1851, was for damages caused by the explosion of a powder magazine in the town of Nashville, containing five hundred kegs of powder. The court, speaking of the anonymous case above mentioned, said: "Chief Justice KENT refers to this case, as reported in 12 Mod. 342, in the case of the People v. Sands, (1 Johns. 78), and discredits it, because of the loose manner in which it is reported, and the book in which it is found. We understand the case as distinctly asserting that if gunpowder be kept in a place dangerous to the inhabitants it is a nuisance. And Lord Holt's report of it, entitles it to full weight, as the judgment of one of the ablest common lawyers that ever sat in Westminster Hall." And it was held that a powder magazine containing a large quantity of powder in a populous place is a nuisance *per se*.

In 1857, the case of Dumesnil v. Dupont, 18 B. Monroe (57 Ky.), 800, was a proceeding to abate as a nuisance a powder house on the plank road within half a mile of the limits of the city of Louisville, within about three hundred yards of plaintiff's residence, and but a short distance of his neighbor's houses. The quantity of powder kept was merely stated to be large. The decision was for the defendant, following People v. Sands and repudiating Cheatham v. Shearon. Concerning the latter case the court said: "This decision cannot be regarded as authority in the case before us for several reasons: First, because it was rendered in an action on the case brought by the owner of certain houses in Nashville, to recover for injuries done to them by the explosion of a powder house owned by

the defendant situated in a populous part of the town. The two cases are therefore essentially different, both with regard to the facts involved, and to the nature of the relief sought.    Secondly, because the principles and reasoning upon which the decision rests, are opposed to the unbroken current of modern authority, English and American, upon this subject." That was a sweeping assertion made as to the English and American authorities.  No English case was cited.  We have here cited them and have shown that they are against the opinion in Dumesnil v. Dupont.  The only American case there cited supporting the assertion is People v. Sands, supra, and the Sands case has long since been repudiated in effect by the courts of New York, as will be hereafter seen.

In the same year that Dumesnil v. Dupont was decided, the error of the court in that case was clearly shown by the decision in Regina v. Lister in the Queen's Bench    (Dearsly & Bell's Crown Cases, 209), in which it was said:  "The indictment certainly does not state that any noxious effluvia issued from the naphtha, or that the air was corrupted by it, or that any bodily harm was done by it to any of the Queen's subjects; but we conceive that to deposit and keep such a substance in such quantities in a warehouse so situate, to the danger of the lives and property of the Queen's subjects, is an indictable offence.  The law of the country would surely be very defective if life and property could be so exposed to danger by the act of another with impunity.  There is no ground for saying that, according to the doctrine contended for by the prosecutor's counsel, neither brandy nor wine, nor oil, nor any ignitible substance, could be kept in the cellar of a townhouse without the owner of the house being liable to fine and imprisonment.  The substance must be of such a nature, and kept in such large quantities, and under such local circumstances, as to create real danger to life and property.  The well-founded

apprehension of danger which would alarm men of steady nerves and reasonable courage, passing through the street in which the house stands, or residing in adjoining houses, is enough to show that something has been done which the law ought to prevent by pronouncing it to be a misdemeanor. Accordingly, to manufacture, or to keep in large quantities, in towns or closely inhabited places, gunpowder (which for this purpose cannot be distinguished from naptha) is by the common law of England a nuisance and an indictable offence.''

In Weir's Appeal, 74 Pa. St. 230, the court said: ''It is not on the ground alone of their liability to fire, primarily, or even secondarily, that they may possibly be dealt with as nuisances, but on account of their liability to explosion by contact with the smallest spark of fire, and the utter impossibility to guard against the consequences, or set bounds to the injury, which, being instantaneous, extends alike to property and persons within its reach. The destructiveness of these agents results from the irrepressible gases once set in motion, infinitely more than from fires which might ensue as a consequence. Persons and property in the neighborhood of a burning building, let it burn ever so fiercely, in most cases have a chance of escaping injury. Not so when explosive forces instantly prostrate everything near them, as in the instances of powder, nitro-glycerine and other chemicals of an explosive or instantly inflammable nature.''

Then came the following cases, all holding that negligence is not necessary: McAndrews v. Collerd, 42 N. J. Law, 189; Heeg v. Licht, 80 N. Y. 579; Emory v. Hazard Powder Co., 22 S. C. 476; Laflin & Rand Powder Co. v. Tearney, 30 Ill. App. 321; Chicago W. & V. Coal Co. v. Glass, 34 Ill. App. 364; Laflin & Rand Powder Co. v. Tearney, 131 Ill. 322; Lounsbury v. Foss, 80 Hun (N. Y.), 296; Wilson v. Phoenix Powder Mfg. Co., 40 W. Va. 413; Reilly v. Erie R. Co.,

76 N. Y. Supp. 620; Remsberg v. Cement Co., 73 Kan. 66; Bradford Glycerine Co. v. St. Mary's Woolen Mfg. Co., 60 Ohio State, 560; Ricker v. Shaler, 85 N. Y. Supp. 825; State v. Paggett, 8 Wash. 579; Kerbaugh v. Caldwell, 151 Fed. 194.

The rule that it is necessary to show negligence is affirmed in Kinney v. Koopman, 116 Ala. 310; Collins v. Railroad, 104 Ala. 390; Kleebauer v. Western Fuse & Explosives Co., 138 Cal. 497.

It is thus seen that the courts of New York have repudiated, in effect at least, the position of Chief Justice KENT in People v. Sands, and are in harmony with the English courts. Ten States of our Union and the Federal court agree on that proposition, while only those of Kentucky, Alabama and California hold to the contrary.

In Emory v. Hazard Powder Co., supra, the court said: "It is not the number of persons affected by a matter that makes it a nuisance, but it is its injurious, offensive, and noxious character; and it is none the less a nuisance because it affects only one or two instead of a multitude. . There may be a private as well as a public nuisance, the distinction being dependent upon the number affected, but the fact of nuisance itself does not depend upon number."

Harper v. Standard Oil Co., 78 Mo. App. 338, is cited as holding that it is necessary to show negligence. The defendant in that case was sued for damages for keeping gasoline and coal oil in large tanks near plaintiff's property, and the danger alleged was not of explosion but of *fire*. We are not discussing the law as to mere combustibles, but confine ourselves to explosives. It is true that coal oil and gasoline may become gas, and thus become explosive, but they were not in that condition in the Harper case.

We thus see that the overwhelming weight of authority supports the conclusion we have reached that powder is dangerous however carefully kept. If there

were any doubt on that question as a matter of law, it is proved to be a fact by three of the defendant's own expert witnesses, who say that powder is dangerous, one of them saying that he knew of no way of operating the mill without the danger of explosion. And that is the case whether the powder is in the mill or magazine.

But counsel for respondent say that there is a mere possibility and not a probability of an explosion, and that such mere *possibility* will not constitute a nuisance. They cite Dumesnil v. Dupont, supra, which does use such language. We have declined to follow that case in its conclusion, and shall not adopt the language used in reaching such erroneous result.

A powder magazine may cause damage in two ways, by *explosion,* which can only occur at irregular intervals; by *danger,* which is always present as to property and persons near enough. That danger, of itself, without an actual explosion constitutes it a nuisance.

In the anonymous case, supra, which is the very fountain of the law on this subject, the Chief Justice said, "To support this indictment there must be apparent danger or mischief already done." The apparent danger is sufficient.

II.  Defendant makes the claim that because it is licensed to do business in Missouri, and because it is conducting a lawful business and its products are useful and necessary for the public welfare and defense, therefore its plant should not be adjudged a nuisance. 3 Blackstone's Commentaries, p. 217, say, "A like injury is, if one's neighbor sets up and exercises any offensive trade; as a tanner's, a tallow chandler's, or the like; for though these are lawful and necessary trades, yet they should be exercised in remote places; for the rule is, *'sic utere tuo ut alienum non laedas*

Licensed and Lawful Business.

(So use your property that you do not injure that of another).' ''

Joyce on Nuisances, section 16, says: ''A business lawful in itself cannot be a nuisance *per se,* although, because of surrounding places or circumstances, or because of the manner in which it is conducted, it may become a nuisance. Certain kinds of business or structures, as powder houses or nitroglycerine works, are so dangerous to human life that they may be maintained only in the most remote and secluded localities.''

In the anonymous case above mentioned it was said that a powder magazine in a dangerous place is a nuisance even though powder is necessary for the defense of the kingdom. ''Misplaced benefactions are malefactions.'' [De Officiis, lib. 2, cap. 18.]

Defendant's license to do business in this State does not place it above a citizen or corporation of this State. [R. S. 1909, sec. 3037.] It still remains subject to the laws as to nuisances.

III. It is a public nuisance.

Joyce on Nuisances, sec. 5, says: ''A public or common nuisance is an offense against the public order and economy of the State, by unlawfully doing any act or by omitting to perform any duty which the common good, public decency or morals, or the public right to life, health, and the use of property requires, and which at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons; even though the extent of the annoyance, injury, or damage may be unequal or may vary in its effect upon individuals. Another factor in defining a nuisance is, that consideration should be given to places where the public have the legal right to go or congregate, or

**Dangerous Area: Evidence.**

where they are likely to come within the sphere of its influence. A nuisance is not public though it may injure a great many persons, the injury being to the individual property of each. A nuisance is public when it affects the rights enjoyed by citizens as part of the public, as the right of navigating a river, or traveling on a public highway; rights to which every citizen is entitled." On that proposition the authorities are practically agreed. The evidence shows that within the circle of danger there are public roads, two villages with post offices, a railroad over which two railroad systems run numerous trains, a public school house, and an entire community. The defendant put in evidence a list of thirty-eight persons to whom it paid damages caused by the explosion of November 12, 1908.

IV. Respondent says that this suit is not prosecuted by the State of Missouri or its Attorney-General, but by individuals in the name of the State and that the Attorney-General has no power to permit this to be done. The petition itself shows that it is brought by the Attorney-General. The evidence shows that the Attorney-General satisfied himself as to the propriety of the suit, signed the petition which had been prepared by counsel for the relators, and authorized it to be filed. The result shows the propriety of this action. The fact that the legal services for the plaintiff in the trial court and in this court were rendered by counsel employed and paid by the relators does not affect the question.

*Whether Prosecuted by State.*

V. We now enter upon the consideration of the question that should never be decided without the exercise of great care and caution. A court of equity must always use a wise discretion in granting injunctions. Counsel for respondents say that we should consider

*Evidence: Damage to Defendant.*

the "relative advantages and disadvantages to the parties concerned." If it is meant by that assertion that substantial, certain and irreparable damages to the plaintiff which might be prevented by injunction are to be left without remedy because of the fact that greater damages and disadvantages would result to the defendant, a wrongdoer, by the issuing of the injunction, we are driven to emphatically say no.

We find the facts to be that the defendant's glaze at the time of its explosion contained about twenty thousand pounds of powder. As operated since then it contains about fifteen thousand pounds. There was during the year 1908 an average of over four hundred thousand pounds in the powder magazine. The dynamite on hands runs from comparatively a small amount to twenty thousand pounds or more. Each one of these three places is a nuisance, dangerous in itself, and the danger of each is increased by the proximity of the others. The explosion of the glaze damaged a passenger train and injured the people in it. Its effect on the school house was such as would have severely injured the pupils had it been in school hours. Large metal shafts were thrown great distances across the road and the railroad, and onto the adjoining lands, and a plate glass window in Grandview four miles away was destroyed. A cistern at Hickman's Mills, over a mile and a quarter away, was cracked. Window glass and sash, doors, plaster, flues and roofs were broken and injured within a radius of two or three miles, the damage diminishing by distance. Dangerous fragments of all kinds were thrown on the adjoining lands. A few frame buildings have been constructed in Holmes Park by reason of the business growing out of the defendant's factory. In all other respects, building and real estate business within the circle of danger have practically ceased. The trial judge who found the issues for the defendant was impelled to say that the value of the land adjoining defendant's plant has been

depreciated thereby one-half. We have made a calculation based on the depreciation of value. For illustration, we have placed a depreciation of $75 an acre on all land except the defendant's within a radius of a half mile from the glaze as a center; $37.50 on all land in the next half mile zone; $12.50 on all within the next mile zone. It aggregates over $160,000. We do not hold that such amount is the exact one; but we feel confident that it is the minimum that could be reasonably fixed. It is bound to increase rapidly as the city grows in that direction. Defendant calls attention to the small amount of damages paid for broken glass and other things. If that were all, we could easily dismiss plaintiff's bill under the doctrine "*de minimis non curat lex*." But the mere replacing of the apparent, superficial damage where a house has been wrecked by such an explosion, does not make the building what it was formerly. Its integrity is destroyed and confidence in it is lost. Ordinarily prudent people will not buy or build subject to such danger.

The evidence shows that the defendant, if compelled to close its works, will lose three-fourths the value of its buildings, machinery and equipment, amounting at first cost to about $120,000, making the loss about $90,000, not allowing for depreciation. That is only a little over half of what is lost by the landowners in the depreciation of their lands. But it is a loss which no court can contemplate without an impulse to prevent it by any legitimate means.

In 1904, the growth of Kansas City, co-operating with the general enhancement of values, began to rapidly increase the value of lands in that rural community, just ready to assume a suburban character. The people there knew nothing of powder works. The defendant was organized by men who were powder experts. They knew its dangers to the community, and they knew of the danger that they might be enjoined. Their contract with the railroad company shows that

fact, and it can be reasonably presumed in the absence of such evidence. The defendant deliberately made its choice of location, and we are called upon to say that the disastrous results of that choice shall fall upon innocent sufferers rather than on the one who invoked the disaster. If the damages caused were not substantial we could refuse to interfere. If they could be remedied at law, that course should be pursued; but that cannot be done. This is a proceeding to abate a public nuisance, detrimental to a large community, to travelers on the public roads and on the railroads and to the public school. There is no practical way in which those interests can be adequately protected except by abating the nuisance.

Respondent cites Bailey v. Culver, 84 Mo. 531. But in that case the court said (1. c. 540): "The right of the plaintiffs, if regard be had to the findings and action of the lower courts, is doubtful; the damage which they will sustain, if any, is inconsiderable, while if their prayer were heard and granted, it would be disastrous in the extreme to the defendants, resulting in the practical destruction of their building, without any material advantages accruing to the plaintiffs." So it will be found that where the comparative injury or inconvenience has resulted in the refusal of relief, it has been where the plaintiff's injuries were trivial, uncertain or remediable by suit at law, or else there have been other considerations which are not in this case. The correct principle was declared by Judge SAWYER in Woodruff v. North Bloomfield Gr. Mining Co., 18 Fed. l. c. 807, as follows: "Of course, great interests should not be overthrown on trifling or frivolous grounds, as where the maxim *de minimis non curat lex* is applicable, but every substantial, material right of person or property is entitled to protection against all the world. It is by protecting the most humble in his small estate against the encroachments of large capital and large interests that the poor man

State ex rel. v. Powder Mfg. Co.

is ultimately enabled to become a capitalist himself. If the small interest must yield to the larger, all small property rights, and all smaller and less important enterprises, industries, and pursuits would sooner or later be absorbed by the large, more powerful few; and their development to a condition of great value and importance, both to the individual and the public, would be arrested in its incipiency. But if the comparison could be made in this instance, it would be impossible to say that the interests of the defendants, and of those engaged in the same pursuits, would be more important than those of complainant, and such as he represents in this contest. The direct contrary is maintained by the complainant with great force and plausibility. But we have nothing to do with this question as to the comparative importance of the conflicting interests, or the inconvenience to the defendants by the stoppage of their works, if they infringe the material, substantial rights of others. It is the province and imperative duty of the court to ascertain and enforce the legal rights of the complainant, no matter what the consequence to defendants may be. This duty no court could evade if it would.''

We will not discuss the question of the loss of the value of the good will of defendant's business, nor of loss on contracts for future supplies of raw materials. We hope no such disastrous results as defendant anticipate will occur. As we conceive our duty, we are powerless to protect the defendant.

VI. It is said that plaintiff is precluded by laches. The defendant, so far as the evidence shows, built its plant without anyone in the community knowing anything about what its contemplated business was to be. The first damaging explosion occurred November 12, 1908. On January 15, 1909, relators applied to the Attorney-General with a petition prepared to be signed and filed in the case.

Laches.

It was filed January 22, 1909, before the plant resumed sometime in February. There was no laches in fact. Moreover, laches will not be imputed to the State. [16 Cyc. 151; United States v. Kirkpatrick, 9 Wheat. (22 U. S.) 720; Terre Haute & I. Railroad v. State ex rel., 159 Ind. 438.]

It has been held that as against the State the defendant cannot claim a right by prescription to maintain a public nuisance. [State ex rel. v. Vandalia, 119 Mo. App. 406; Smith v. Sedalia, 152 Mo. 283.]

There has been no suggestion made that defendant's business could be so conducted that the amount of explosive in any one place would be such as not to endanger property or persons outside of defendant's grounds. If such a thing is possible, the defendant should be permitted to show such fact in the circuit court.

The judgment is reversed and the cause remanded with directions to enter a decree in accordance with the prayer of the petition, with leave to the defendant to thereafter make a showing, if it sees proper so to do, on the question as to whether it can operate its powder mill or maintain powder or dynamite magazines on its grounds in such a way that the amount of explosive in any one place at one time will not be dangerous to persons or property outside of defendant's grounds, and in such a way that the explosive in one place will not be in danger of explosion from the powder or dynamite in any other place. If on such showing it appears that defendant's business can be so operated without danger to property or persons outside defendant's grounds, the decree should then be modified accordingly. *Williams, C.,* concurs.

PER CURIAM.—The foregoing opinion of Roy, C., is adopted as the opinion of the court. All of the judges concur.