William E. SCHLUEMER and Elizabeth L. Schluemer, Respondents,

v.

B. Russell ELROD and Francis Elrod, Appellants.

No. 20016.

Missouri Court of Appeals,
Southern District,
Division Two.

Jan. 18, 1996.

Motion for Rehearing
and Transfer to Supreme Court
Denied Feb. 9, 1996.

Application to Transfer Denied
March 26, 1996.

John A. Clayton, Thomas, Birdsong & Clayton, P.C., Rolla, for appellants.

Philip E. Prewitt, Andereck, Evans, Milne, Peace & Baumhoer, Jefferson City, for respondents.

CROW, Judge.

This is a dispute about a "roadway easement." Plaintiffs, William E. Schluemer and Elizabeth L. Schluemer, own the servient estate [1]; Defendants, B. Russell Elrod and Frances [2] Elrod, own the dominant estate.

The deed creating the easement (Exhibit B) reads, in pertinent part:

"Grantees [3] Shall Pay to the record owners of the land where the easements are located the sum of One Hundred Dollars per year starting July 1, 1983, and each and every July 1 thereafter, as long as grantees shall have the use of the easements described above, to be used to help maintain the roadways located on said easements."

The case was tried by the court without a jury on three counts (I, IV and V) of Plaintiffs' five-count first amended petition [4] and Defendants' counterclaim.

Count I was based on the above-quoted provision of Exhibit B and sought judgment against Defendants for $100 per year commencing with Plaintiffs' purchase of the servient estate in November, 1984.

Count IV sought an injunction barring Defendants from littering and trespassing on Plaintiffs' land and forbidding Defendants from using the easement for any purpose except ingress and egress.

Count V sought an order compelling Defendants to release part of the easement which, according to Plaintiffs, was unnecessary for access to Defendants' land.

In their answer to Count I, Defendants claimed they were entitled to a "set-off" [5] of $440 [6] against Plaintiffs' claim. In their counterclaim, Defendants prayed for judgment commanding Plaintiffs to bring the roadway into such condition that it "can be traversed ... with a [sic] ordinary automobile."

The trial court entered judgment accompanied by extensive findings of fact and conclusions of law. The judgment: (a) awarded Plaintiffs $1,000 on Count I and denied Defendants' prayer for a setoff; (b) granted relief on Count IV by barring Defendants from using the easement for any purpose except ingress and egress, and by ordering locks placed on two gates to control access to the easement; (c) denied Count V; (d) awarded Defendants no relief on their counterclaim.

Defendants bring this appeal. The first of their three points relied on attacks the judgment on Count I. The point reads:

---

1. In *Rollins v. Schwyhart*, 587 S.W.2d 364, 367 (Mo.App.S.D.1979), an owner of land subject to an easement is referred to as owner of the servient estate; the owners of the easement are referred to as owners of the dominant estate.

2. This forename appears as "Francis" in the pleadings, but as "Frances" in the transcript and in a deed. We assume the latter spelling is correct.

3. Defendants.

4. Counts II and III were severed by the trial court and ultimately dismissed by Plaintiffs following entry of the judgment from which this appeal arises.

5. *Edmonds v. Stratton*, 457 S.W.2d 228, 232 (Mo.App.1970), characterizes "set-off" as a term loosely and confusingly used. According to *Edmonds:* "[V]ery generally speaking, the garden variety of set-off is defined as a remedy employed by a defendant to discharge or reduce the plaintiff's demand by an opposite one arising from a transaction which is *extrinsic* to the plaintiff's cause of action." *Id.*

6. Defendants *pled* they were entitled to a $440 setoff, but *prayed* for a $460 setoff. The twenty dollar discrepancy is unexplained.

"The trial court erred in overruling the counterclaim [sic] of ... Elrods ... for a setoff against the $1000.00 owed to ... Schluemers ... because it was the Schluemers' obligation to maintain the roadway easement in that the deed granting the Elrods the easement fixed the Elrods' obligation for helping to maintain the easement at $100.00 per year and since the Schluemers failed to maintain the easement in a good enough condition for the Elrods to access their river lot they were entitled to expend moneys on the easement necessary to keep it in a good enough condition for the Elrods to access their river lot and set that amount off against their obligation to pay to the servient estate $100.00 per year."

■ We preface our discussion of the above contention with an account of the pertinent facts. We gather them from the pleadings, evidence and briefs.[7]

In 1983, Defendants purchased two parcels of land in Maries County from W.H. Stratman and Katherine Stratman: a 5.36–acre tract adjacent to Highway 42 and a .46–acre tract abutting the Gasconade River. No public road reaches the smaller tract.

The Stratmans retained ownership of a farm between Defendants' two tracts. To enable Defendants to reach the smaller tract, the Stratmans granted Defendants the "roadway easement" mentioned in the first sentence of this opinion.[8] The easement (part of which is forty feet wide and part of which is thirty feet wide) begins at Highway 42 adjacent to Defendants' larger tract and proceeds across the Stratman farm approximately one and one-fourth miles to Defendants' smaller tract.

Defendants reside on their larger tract. Because that tract abuts Highway 42, Defendants do not use the easement for access to the highway. When Defendants go from

their larger tract to their smaller tract, they enter the easement at a point where it abuts their larger tract behind their house.

On November 5, 1984, the Stratmans conveyed their farm—the servient estate—to Plaintiffs.

Defendants presented evidence that Plaintiffs thereafter failed to maintain the road over the easement in good enough condition for Defendants to reach their smaller tract by motor vehicle. Defendants admitted they never paid Plaintiffs the $100 per year required by Exhibit B, but claimed they paid for gravel and performed labor on the road in an effort to maintain it in usable condition. According to Defendants' evidence, those expenses and labor totaled $825.[9] Defendants insisted they were entitled to a setoff against the sum claimed by Plaintiffs on Count I ($1,000 at time of trial).

The trial court made no finding regarding the expenditures allegedly made by Defendants or the value of the labor allegedly performed by them in maintaining the road. Instead, the trial court resolved Count I and Defendants' prayer for a setoff by holding that Defendants, as owners of the dominant estate, "have an obligation to maintain the easement roadway." Therefore, reasoned the trial court, Defendants are not entitled to a setoff against the $100 per year they must pay Plaintiffs pursuant to Exhibit B. Consistent with that analysis, the trial court, as reported earlier, entered judgment for Plaintiffs on Count I for $1,000.

Defendants begin the argument under their first point by acknowledging *Stotzenberger v. Perkins,* 332 Mo. 391, 58 S.W.2d 983, 987[6, 7] (1933), which states that where a roadway easement is created by deed, the owner of the dominant estate has the right to maintain the roadway in a condition for pas-

---

7. Where a statement of fact is asserted in one party's brief and conceded to be true in the adversary's brief, we may consider it as though it appears in the record. *Nastasio v. Cinnamon,* 295 S.W.2d 117, 119[1] (Mo.1956); *Thornbury v. Morris Oil Co., Inc.,* 846 S.W.2d 238, 239[1] n. 2 (Mo.App.S.D.1993).

8. The easement is described in the deed by which the Stratmans conveyed the two tracts to Defendants (Exhibit B). As reported earlier, the provision regarding the annual $100 payment appears in Exhibit B.

9. That sum exceeds the amounts set forth in Defendants' answer to Count I. *See:* footnote 6, *supra.*

sage, and the owner of the servient estate is under no obligation to maintain or repair.

However, Defendants call our attention to *McDonald v. Bemboom,* 694 S.W.2d 782 (Mo. App.W.D.1985), where owners of the dominant estate and owners of the servient estate each used a road across an easement on a regular and continuing basis. *Id.* at 783. In *McDonald,* the appellate court held:

"A respectable body of authority in other jurisdictions holds that apportionment of the cost of repairs and maintenance of a private roadway between the owners of the dominant and servient tenements is fair and just, even though the agreement creating the easement is silent with respect thereto, where the owners of both the dominant and servient tenements regularly use the private roadway."

*Id.* at 786[2] (citations omitted).

*McDonald* affirmed a judgment in favor of the owners of the dominant estate against the owners of the servient estate for the latters' proportionate share of repair and maintenance costs for the roadway.

In the instant case, the trial court found Plaintiffs "generally use the road for access to their fields, pastures and to the Gasconade River."

Plaintiffs do not dispute the above finding. Plaintiffs concede they "conduct a farming operation on the servient estate and use the roadways on the easement to access various parts of the servient estate as well as for placing cattle feeders." Additionally, explain Plaintiffs, some parts of the servient estate can be accessed only by use of the roadways on the easement because of the terrain.

Inasmuch as the easement was created by Exhibit B, we first look to it to determine the parties' obligations regarding maintenance of the roadway. *Rollins v. Schwyhart,* 587 S.W.2d 364, 366 (Mo.App.S.D.1979). The only provision in Exhibit B regarding maintenance is the one quoted earlier, which requires Defendants to pay "the record owners" of the servient estate $100 per year "to

be used to help maintain the roadways located on said easements."

As we have seen, the grantors in Exhibit B were W.H. Stratman and Katherine Stratman, who retained ownership of the servient estate at the time they executed Exhibit B.

Defendants' smaller tract is referred to in Exhibit B as "Tract 'A.' "

In 1979, at the request of W.H. Stratman, a surveyor prepared a survey of the Stratmans' land (which then included the land now owned by Plaintiffs and the two tracts now owned by Defendants).[10] The survey shows Tract A, the north side of which abuts the Gasconade River. The survey also shows four other tracts abutting the river, designated as Tracts B, C, D and E. They lie side-by-side, east of tract A. The easement roadway is shown on the survey, abutting the south sides of all five tracts. The survey recites that all five tracts shall have a "non-exclusive easement for roadway purposes ... over the present roadway which ... connects with Missouri Highway No. 42."

Plaintiff William E. Schluemer testified that when he bought the servient estate, the Stratmans told him they "had platted lots along the river" and gave him the survey. Mr. Schluemer conceded the survey described a nonexclusive roadway easement for each of the platted lots.

However, we glean from the record that except for Tract A, the Stratmans sold none of the platted lots before conveying the servient estate to Plaintiffs. The deed from the Stratmans to Plaintiffs excepts Tract A, but does not mention Tracts B, C, D or E. As we comprehend the deed, the land comprising the latter four tracts is included in the metes and bounds description of the servient estate.

Defendants argue that the provision in Exhibit B regarding maintenance of the roadway is unambiguous. According to Defendants, the provision unequivocally assigns the duty of maintaining the roadway to the owners of the servient estate alone, and Defendants' only obligation is to pay the servient

10. The survey comprises three documents, received in evidence as Defendants' Exhibits 7, 8 and 9.

owners $100 per year to help defray maintenance expenses. However, add Defendants, if the provision in Exhibit B is ambiguous, parol evidence may be considered in determining the parties' intent. Defendants assert that the evidence set forth in the five paragraphs immediately preceding this one demonstrates that the Stratmans and Defendants intended that the owners of the servient estate alone must maintain the roadway, and that the owners of the dominant estate must pay the servient owners $100 per year.

Plaintiffs contend Exhibit B is ambiguous and can be construed to place the maintenance obligation on Defendants. Consequently, say Plaintiffs, the trial court properly denied Defendants' prayer for a setoff.

We shall assume, arguendo, that Exhibit B is ambiguous, hence parol evidence may be considered in ascertaining the parties' intent. *Homan v. Hutchison,* 817 S.W.2d 944, 949[10] (Mo.App.W.D.1991); *Graessle v. State Highway Commission,* 784 S.W.2d 213, 216[6] (Mo.App.W.D.1989); *Pope v. Kirschner,* 742 S.W.2d 240, 242[3] (Mo.App.W.D. 1987).

Had the Stratmans, instead of selling the servient estate to Plaintiffs, sold Tracts B, C, D and E to sundry buyers, inserting a provision similar to the one in Exhibit B in the deeds to those buyers, we doubt the Stratmans could have successfully argued that the duty of maintaining the easement roadway was to be shared by all buyers. Assigning five sets of property owners the duty of maintaining an easement used by all, with no method of determining each one's share of the obligation, would likely result in quarrels and chaos. It is inferable that the Statmans understood this and intended to bear the responsibility of maintaining the roadway, collecting an annual sum from each property owner to defray the cost.

However, that scenario never eventuated. The year after selling Defendants Tract A and the tract abutting Highway 42, the Stratmans conveyed all of the servient estate to Plaintiffs. We thus have a situation where only Defendants and Plaintiffs (and their invitees) have a right to use the roadway. Although Plaintiffs argue that Defendants use the roadway more than Plaintiffs, the trial court made no finding on that issue.

Because Defendants and Plaintiffs (and their invitees) use the roadway, one could argue that *McDonald,* 694 S.W.2d 782, should apply, producing a holding that the duty of maintaining the roadway must be borne equally by Defendants and Plaintiffs. However, in *McDonald* the document creating the easement was silent regarding maintenance. Here, Exhibit B addressed that subject. In that respect, the instant case is analogous to *Rollins,* 587 S.W.2d 364.

In *Rollins,* the document creating a roadway easement required the owners of the dominant estate to install and maintain two cattle guards, one where the easement met a public highway and one at the opposite end of the easement. *Id.* at 366. Except for that requirement, the document was silent as to maintenance. *Id.* The owners of the servient estate reserved an equal right to use the roadway. *Id.*

The servient owners claimed the dominant owners should share in the maintenance. The trial court held otherwise. Affirming the judgment, this Court said:

"The agreement does not refer to maintenance of the roadway other than the cattle guards. To find [the dominant owners] obligated to maintain the other portions of the roadway, we would have to determine that it is implied from the terms of the document or that they are required to maintain it because of ownership and use of the easement. To imply a provision of maintenance where none occurs would be to create an obligation which the parties may not have intended. We should not imply unexpressed conditions as it may make an agreement contrary to what was intended. Courts are careful not to imply a term as to which the contract may be intentionally silent. We should not make a new contract for the parties or rewrite their contract by construction....

... The agreement here covers maintenance of a part of the right of way, the cattle guards. That maintenance is the requirement of [the dominant owners] and their predecessors. The agreement is si-

lent as to any obligation of the [dominant owners] to maintain the remainder of the way. The parties provided for maintenance of part of the roadway. Where an agreement expresses one thing of a class, it implies exclusion of all not expressed...."

*Id.* at 366 (citations omitted).

The above principles caution us that inasmuch as Exhibit B in the instant case assigned Defendants the duty of paying the owners of the servient estate $100 per year "to be used to help maintain the roadways," but assigned Defendants no other duty, Exhibit B should not be construed to place the obligation for maintaining the roadway on Defendants. Furthermore, the evidence regarding the 1979 survey showing Tracts B, C, D and E and the nonexclusive easement for access to those tracts from Highway 42 indicates that when Defendants acquired Tract A and the tract where they reside from the Stratmans, neither Defendants nor the Stratmans intended that Defendants maintain the roadway.

For the reasons in the preceding paragraph, we hold the trial court erred in finding that Defendants have an obligation to maintain the roadway.[11] We hold as a matter of law that Exhibit B assigns the duty of maintaining the roadway to the owners of the servient estate (currently Plaintiffs), and that the only obligation of the owners of the dominant estate (currently Defendants) is to pay the servient owners $100 every July 1.

■ However, as explained in *Stotzenberger*, 58 S.W.2d at 987, the owners of the dominant estate have the *right* to maintain the roadway in a condition such that it can be traversed. Consequently, if Plaintiffs fail to maintain the roadway in that condition, Defendants may do so. If that becomes necessary, Defendants shall have a claim against Plaintiffs for the necessary and reasonable expenses incurred by Defendants, which Defendants can assert as an offset against the $100 per year they must pay Plaintiffs.

■ We do not imply that Plaintiffs must pave the roadway and maintain it in turnpike condition. The record indicates Defendants were aware of the condition of the roadway when they acquired their two tracts from the Stratmans in 1983, and that the roadway was usable at that time. That should be the standard by which Plaintiffs' maintenance obligation shall be measured.

We recognize future disputes may arise about maintenance. However, there is no way to judicially eliminate that possibility. If Defendants alone had the maintenance obligation and disdained it, Plaintiffs would have to shoulder the burden if they wanted to continue using the roadway. In that event, Plaintiffs, if they chose, could seek redress from Defendants.

If the maintenance obligation were assigned to the parties equally, the same possibility for disputes would exist.

As noted earlier, the trial court made no finding regarding the reasonableness and necessity of the expenses allegedly incurred by Defendants and the value of the labor allegedly performed by them in maintaining the roadway after Plaintiffs' acquisition of the servient estate in 1984. Consequently, the case must be remanded to the trial court for a determination of the amount of the offset, if any, to which Defendants are entitled against Plaintiffs' claim on Count I.[12]

Additionally, the trial court shall strike from the judgment its ruling that Defendants are obligated to maintain the roadway, and replace that ruling with a declaration that Plaintiffs must maintain the roadway. The trial court's ruling that Defendants must pay Plaintiffs $100 per year is correct, and is affirmed.

Defendants' second point attacks one segment of the relief granted by the trial court on Count IV.

**11.** In the portion of the judgment adjudicating Count IV, the trial court declared Defendants "have the primary responsibility in maintaining the road."

**12.** As we have seen, Defendants prayed for the offset in their answer. Plaintiffs did not argue in the trial court that Defendants should have sought the offset in a counterclaim, and Plaintiffs make no such contention here. Accordingly, we do not address that subject.

In seeking injunctive relief on that count, Plaintiffs presented evidence that trespassers had driven motor vehicles across Plaintiffs' fields, cutting ruts which cause erosion and destroy grass upon which Plaintiffs' cattle graze. Plaintiffs also presented evidence that they had found cans and other litter on their land, that trees had been cut on their land, and that one of their calves was found dead, apparently struck by a motor vehicle.

As we comprehend the evidence, there is a gate where the easement meets Highway 42 ("the highway gate"), and a gate where Defendants enter the easement from their larger tract "(the Elrod gate") en route to their smaller tract.

The relief granted on Count IV includes an order that a lock be placed on the highway gate and a lock be placed on the Elrod gate. Plaintiffs are required to buy the locks and keys. The locks are not to be removed except for ingress and egress. The judgment further provides:

> "Each of the Elrods shall have an individual key. No additional key may be given for access to the lock on the highway gate. Regarding the Elrod access gate, copies of the key may be made. The party giving any other person a copy of the key to the Elrod gate must notify all other parties that such a key has been given and to whom. This must be done in writing. No more than three key copies may be made by the Elrods for the Elrod gate."

Defendants' second point launches several assaults on the above relief.

■ We first consider the highway gate.

Defendant Frances Elrod testified that when Defendants and their invitees go from Defendants' larger tract to their smaller tract, they never use the highway gate; they always use the Elrod gate. Her testimony continued:

"Q. On the gate on Highway 42. Would that be reasonable to put a lock on there?

A. That leads into where Mr. Schluemer goes?

Q. Correct.

A. Yes. I definitely feel that he should put one in here if his property is being tore up.... I think with our gate the way it is and his gate over there, if he wants to keep it locked, we can [control] who comes in on our side. And there shouldn't be anybody going in and out that we don't know.

Q. Are you always at home?

A. My husband is.

Q. Do you always know when people go through your gate to the river property?

A. Yes, we do."

The trial court could have reasonably concluded from that testimony that Defendants had no objection to a lock on the highway gate, particularly inasmuch as Defendant Russell Elrod, who testified later in the trial, did not contradict his wife's testimony on that subject. Indeed, Defendants' brief concedes that a lock on the highway gate "does not materially interfere with [Defendants'] use of the easement and river lot at this time."

■ If the trial court erred in ordering the lock on the highway gate—an issue we need not decide—the error was invited by Mrs. Elrod's testimony. A party cannot lead a trial court into error and then employ the error as a source of complaint on appeal. *In re Marriage of Collins*, 875 S.W.2d 643, 648[8] (Mo.App.S.D.1994); *Reed v. Rope*, 817 S.W.2d 503, 509[11] (Mo.App.W.D.1991).

■ However, Defendants complain, and we agree, that the provision that each Defendant may have only one key to the highway gate "materially affects [Defendants'] ability to market the river lot to third persons." We therefore hold the trial court should amend the judgment to provide that if Defendants sell the "river lot" (their smaller tract), which sale would presumably include the easement, the provision requiring a lock on the highway gate shall automatically terminate.

■ The Elrod gate requires a different analysis in that it is Defendants' entrance to the easement—the route from their home to

their smaller tract. The evidence showed Defendants and their invitees regularly use the smaller tract for recreation, as it borders the Gasconade River. The heaviest use is on weekends and holidays. The trial court declined to limit the number of people Defendants may invite to the smaller tract. Because Plaintiffs did not appeal, that ruling is unchallenged.

If the trial court's purpose in ordering the locks was to keep uninvited people off Plaintiffs' land, it appears the only lock that will serve such purpose is the one on the highway gate. Defendants can allow anyone they choose to enter the easement through their gate. All they have to do is unlock it or loan the invitee a key. Once an invitee enters the easement, there is no way to ensure he will stay on the easement and keep off Plaintiffs' fields. Consequently, we fail to see how requiring the Elrod gate to remain locked and limiting the number of keys will prevent trespass from the easement onto Plaintiffs' land.

Plaintiffs point out they keep cattle on their land, which can escape if the Elrod gate is open. However, keeping it shut will confine the cattle, whether or not it is locked.

We have carefully studied Plaintiffs' brief and have found no plausible explanation as to how Plaintiffs' property will be better protected by a lock on the Elrod gate than by simply requiring Defendants to keep the gate latched except when entering or exiting the easement.

■■■ We are mindful that molding an appropriate injunctive decree rests largely in the sound discretion of the trial court, which is vested with a broad discretionary power to shape and fashion relief to fit the particular facts, circumstances and equities of the case before it. *May Department Stores Co. v. County of St. Louis*, 607 S.W.2d 857, 870[9] (Mo.App.E.D.1980). However, while the decree should grant the relief to which the parties are entitled, it should be narrowly framed and should not interfere with any legitimate or proper activities. *Terre Du Lac Property Owners' Association, Inc. v. Wideman*, 655 S.W.2d 803, 807[15] (Mo.App. E.D.1983). That is, relief is to be granted

sparingly in clear cases only. *Henson v. Payne*, 302 S.W.2d 44, 50[9] (Mo.App.1956).

Applying those principles, we hold the trial court abused its discretion in requiring a lock on the Elrod gate. The trial court shall strike that proviso from the judgment and replace it with a requirement that Defendants keep the Elrod gate closed and latched except when they or their invitees enter or exit the easement.

■■ The relief granted by the trial court on Count IV also included this:

> "[A]n easement road is to be used solely for the purpose of ingress and egress. It is not a general parking area. Wherefore, this Court hereby sets forth its injunction ordering that there shall be no parking on the easement road itself. Therefore, the Elrods are hereby enjoined from utilizing the easement road for any purpose except ingress and egress onto the property."

Defendants' third point asserts the above provision is erroneous in that they "have the right to reasonable use of the easement in connection with the river lot, including parking there." Defendants cite only one case in support of that hypothesis. The case is inapposite, as it does not involve parking on a roadway easement.

As Plaintiffs point out, the easement is for access to Defendants' smaller tract, not a parking lot for Defendants and their invitees. Indiscriminate parking on the easement could result in blocking it, thereby denying its use to Plaintiffs and their invitees.

We hold the bar against parking on the easement is supported by substantial evidence and is not against the weight of the evidence, that no error of law appears, and that an opinion on that issue would have no precedential value. Accordingly, Defendants' third point is denied, and the provision in the judgment barring parking on the easement is affirmed in compliance with Rule 84.16(b)(1) and (5), Missouri Rules of Civil Procedure (1995).

We shall not lengthen this opinion with a recapitulation of all of our rulings. On remand, the trial court and the parties can easily extract the rulings from the text.

We affirm the denial of relief on Count V of Plaintiffs' petition. As to Count I of Plaintiffs' petition, Count IV of Plaintiffs' petition, and Defendants' counterclaim, we affirm the judgment in part and reverse it in part as set forth in this opinion, and remand the cause to the trial court for further proceedings. Costs of this appeal are taxed half against Plaintiffs and half against Defendants.

SHRUM, C.J., and PARRISH, J., concur.