

# In the Missouri Court of Appeals
# Eastern District

**SOUTHERN DIVISION**

| | |
|---|---|
| STATE OF MISSOURI, ex rel.<br>ATTORNEY GENERAL ERIC S. SCHMITT, | No. ED107970 |
| Respondent, | |
| | Appeal from the Circuit Court of<br>Madison County |
| vs. | Cause No. 18MD-CC00147 |
| GARY HENSON, ET AL., | Honorable Wendy Wexler Horn |
| Appellants. | Filed: April 14, 2020 |

## OPINION

Gary Henson ("Gary"), Rebecca Henson ("Rebecca")[1] (collectively, "the Hensons"), and

Offsets Recreation, LLC ("Offsets Recreation") (collectively, "Appellants") appeal the trial

court's judgment permanently enjoining Appellants from operating the commercial swimming

and diving facility on the Hensons' property ("the Offsets") and/or charging admission to such

facility until Appellants meet certain conditions to make operation of the Offsets safer for guests.

The State filed its petition requesting a permanent injunction and its motion for preliminary

injunction against Appellants on the grounds that Appellants' operation of the Offsets was a

public nuisance, and after a bench trial, the trial court concluded that Appellants' operation of the

---

[1] Because Gary and Rebecca Henson have the same surname, we refer to them by their first names to avoid confusion, but intend no familiarity or disrespect.

1

Offsets constituted a public nuisance because it interfered with the "common community right of public safety."

Appellants raise four points on appeal. In their first point, Appellants argue that the trial court erred in concluding that Appellants' operation of the Offsets was a public nuisance because "Missouri does not recognize a cause of action for a public nuisance where the alleged activities are solely on private property and where the public has no right to enter and which enterprise does not interfer[e] with a right common to the general public." In their second and third points, Appellants assert that the trial court erred by enjoining Rebecca (Point II) and Gary (Point III) because there was no evidence presented before the trial court demonstrating that either owns or operates the Offsets. And in their fourth point, Appellants contend that the trial court erred in concluding that their operation of the Offsets constituted a public nuisance because "the evidence does not support a public nuisance because nine deaths over thirty-two years is not a public nuisance."

Finding that the trial court did not err in any of the ways asserted by Appellants, we affirm the judgment of the trial court.

## I. Factual and Procedural Background

On July 30, 2018, the State filed its petition in the Circuit Court of Madison County. The State asserted that Appellants' operation of the Offsets was a public nuisance, as nine people had died at the Offsets since the commercial swimming and diving operation began in the mid 1980's on what is now the Hensons' property. The State requested that the trial court enjoin Appellants from operating the Offsets until the complained of dangerous conditions were remediated. A bench trial was held on the matter on May 15, 2019.

At trial, the State offered several exhibits detailing Appellants' operation of the Offsets,[2] the Hensons' ownership of the property on which the Offsets was operated, and the deaths that occurred at the Offsets since Appellants began operating it. Those exhibits included a deposition given by Gary before trial, photographs of the Hensons' property and signs on/leading to the property, coroner's reports on seven of the persons who died at the Offsets,[3] the articles of incorporation of Offsets Recreation, and Offsets Recreation's lease of the Hensons' property. Additionally, the State presented testimony by Tyler Wood ("Wood") (an investigator with the Missouri Attorney General's Office), Collin Follis ("Follis") (the current Madison County coroner), Sheriff Katy McCutcheon ("Sheriff McCutcheon") (the current sheriff of Madison County), Michael Oostman ("Oostman") (an expert witness on aquatic safety risk management), and Melissa Duffell (mother of one of the persons who drowned at the Offsets). In response, Appellants presented exhibits further detailing operation of the Offsets, including more photographs of the Hensons' property and the waiver drafted by Appellants that guests of the Offsets had to sign before entering the Hensons' property. Appellants also presented testimony by Sharon Marshall (the Hensons' daughter), Richard Menendez (a frequent guest of the Offsets), and Gary.

In sum, the evidence presented showed the following. The Hensons own property in Madison County, Missouri at which Gary/Offsets Recreation manages the Offsets commercial swimming and diving operation; that property contains a quarry (previously a lead mine) that is now flooded, resulting in an approximately five-acre lake that is surrounded by bluffs of varying

---

[2] We use "Appellants' operation of the Offsets" or similar phrasing to reference Appellants' combined operation of the Offsets and allowing the Offsets to be operated on the Hensons' property; we recognize that there was no evidence admitted at trial that Rebecca "owned or operated" the Offsets commercial swimming and diving enterprise.

[3] The coroner's reports for two people who died at the Offsets in 1989 could not be located.

heights—the highest of which are at least 40 feet above the water of the lake. The Hensons purchased the property from Gary's father in the mid 1980's, but, since the early 1980's, Gary has managed the Offsets as a commercial enterprise that charges members of the public for admission to the property so that they may swim and dive in the quarry, hike, and camp overnight. Gary ran the Offsets as a sole proprietor until 2009, when he organized Offsets Recreation, of which he is the sole member and manager. Offsets Recreation has leased the Hensons' property since 2009, with the exception of the 2015 and 2016 swimming seasons, when the Hensons' son operated a similar commercial swimming and diving enterprise at the property. Gary/Offsets Recreation invites members of the public to the Offsets using roadside and social media advertisements, which result in upwards of hundreds of people visiting the Offsets on a given day.

Since 1989, nine people have died at the Offsets: four died while swimming in the quarry, while the other five died from injuries sustained from jumping or falling into the quarry from the bluffs above. Upon entering the Offsets, guests must sign a waiver notifying them of general dangers on the property and that they swim and dive at their own risk. Additionally, an employee of Gary/Offsets Recreation verbally warns guests not to jump off the high bluffs into the quarry, and there are signs at some locations on the Hensons' property warning guests not to "flip" off the high points of the bluffs, that there is no lifeguard on duty, and that guests swim at their own risk. Appellants do not station lifeguard-trained or CPR-trained staff that monitor the water at the Offsets, allow guests to bring and consume substantial amounts of alcohol on the property, do not have rescue or medical equipment readily available in case of injury (other than a flotation ring), minimally supervise guests who are swimming or diving, do not require guests to wear life vests when jumping from the bluffs or during any other activity at the Offsets, allow

guests to jump from any points on the bluffs/do not instruct from where guests should or should not jump, and have warning signs posted only at certain points on the property, none of which warn of the dangers of swimming, falling, jumping, flipping, or diving in the quarry.

Oostman, an expert witness on aquatic safety risk management, testified specifically about the dangers present at the Offsets and Appellants' failure to adequately warn against those dangerous conditions or reasonably act to prevent or prepare for injuries caused by said dangers. Oostman visited the Offsets and inspected it during February of 2019[4] after being contacted by the Missouri Attorney General's Office. During his visit, Oostman took several photographs (which were entered into evidence) of the conditions and signs present at the Offsets, and opined during his testimony why he thought the measures taken by Appellants were insufficient to warn guests of the dangerous conditions. In particular, Oostman opined that the Offset's warning signs failed to sufficiently warn of the consequences (i.e., injury or death) of jumping, swimming, and diving in the quarry, were not in proximate enough locations to the dangerous conditions to effectively warn guests, and did not adequately inform guests how to safely engage in jumping off the high bluffs. Oostman further opined that, based on Gary's deposition and other evidence, the Offsets was inadequately staffed to enforce the Offsets's rules or ensure guests were acting safely, failed to place any lifeguard-trained employees waterside, did not have an emergency response/action plan other than calling 911, and failed to have proper safety/medical equipment such as backboards, rescue tubes, or ventilation equipment. Oostman also opined that allowing

---

[4] Oostman's visit occurred when it was not swimming/diving season, and the Offsets therefore had no staff present around the quarry during that time. However, Wood, who inspected the Offsets in July of 2018 (during swimming/diving season), noted during his testimony (which preceded Oostman's) that he saw no staff members monitoring the water, saw no rescue or medical equipment near the water except for a flotation ring, and saw only one employee briefly after entering the property during his visit.

5

guests to consume alcohol while at the Offsets further contributed to a greater risk of injury or death in that intoxication affects the judgment of guests swimming or diving in the quarry.

On May 23, 2019, the trial court entered its judgment concluding that the Offsets was a public nuisance and permanently enjoining Appellants from operating the Offsets as a commercial swimming and diving facility and/or charging admission to the Offsets until certain conditions were met. In its judgment, the trial court made detailed findings of fact regarding Appellants' ownership and operation of the Offsets, the deaths that have occurred at the Offsets since 1989, the dangerous conditions present at the Offsets, and the measures that Appellants did or did not take to prevent and prepare for injuries caused by those dangerous conditions. The trial court specifically referenced the testimony of Oostman, and found him to be a qualified expert and that his opinions were well-founded and based on his extensive experience and observations of the evidence. In particular, the court found (in accordance with Oostman's testimony) that: "the Offsets contains many dangers, including the harsh impact of the water on the body when jumping from high bluffs, the loose terrain, and the lack of institutional control over the guests due to the complete freedom of the guests to jump into the water from anywhere around the lake"; "the warnings given at the Offsets are deficient in several ways"; Appellants "fail to ameliorate these significant risks to life by failing to provide staff supervision of jumping, … provide lifeguards, … have a rescue response plan in place, and … have proper safety equipment such as backboards, rescue tubes, and ventilation equipment."

The trial court further found that Appellants fail to adequately warn guests of the dangers associated with swimming and jumping from the high bluffs, had no personnel stationed at the Offsets who were trained or certified in lifeguarding, water rescue, CPR, or first aid, and had no personnel who are solely dedicated to patrolling the facility to insure that guests follow rules,

6

have the physical capacity needed to swim and dive safely, and are not creating unnecessary risks to their own safety or that of other guests. Additionally, the court found that Appellants had no formal rescue or response plan in place for water emergencies other than to call 911. The court noted that "there is insufficient time [for first responders] to respond to a struggling swimmer in order to prevent a drowning, serious physical injury, or death." The court also found that Appellants permit guests to jump from anywhere on the bluffs that surround the lake, which make it "more difficult to monitor behavior and look for signs of distress" and "increases the odds that a guest may inadvertently collide with another guest when jumping," and do not instruct guests on how to safely jump from the cliffs other than advising guests not to perform front flips or back flips from the highest bluffs. The court further noted that Appellants "allow guests to bring limitless amounts of alcohol into the property" and that "[e]xcessive alcohol consumption has contributed to several deaths on the property." Lastly, the trial court found that "[d]espite the nine deaths on the property by patrons using the facility as intended, [Appellants] have made at most minor attempts to reduce the risks of serious physical injury or death."

The trial court concluded that "[Appellants'] use of their property as described above constitutes a public nuisance, in that they interfere with common community right of public safety," and "[t]he deaths caused and the risks borne by the guests of the Offsets is against the public order of the state and endangers a considerable number of persons." Further citing the grave risk to the public that the Offsets posed, the court granted the State's request for a permanent injunction against Appellants because there was no adequate remedy at law for those injured at the Offsets and because the risk of serious physical injury or death constitutes irreparable harm in that monetary damages cannot adequately compensate for physical injury or loss of life. As such, the court permanently enjoined Appellants, their officers, agents,

7

employees, sales persons, contractors, representatives, assigns, successors in interests, and any other individuals acting on their behalf or at their discretion and prohibited them from operating the Offsets as a commercial swimming and diving facility and/or charging admission to the Offsets until certain conditions were met.

Those conditions included that: Appellants establish an emergency response plan prepared by a water safety expert and conduct trainings with all staff prior to the start of each operating season and at least monthly during the operating season; Appellants permit only jumping feet first into the quarry from designated jumping areas that are staffed by a certified lifeguard and have warning signs advising guests that previous patrons have died jumping off the cliffs and showing a pictograph and instructions on safe jumping technique; that lifeguards stationed at the designated entry points direct guests to the warning signage, instruct guests on how to jump from the designated point to minimize the risks of serious physical injury or death, and permit guests to enter the water only after ensuring that the entry point in the water is clear of other swimmers; that an additional certified lifeguard be stationed in the water in a boat and be equipped with CPR hip packs and rescue tubes that have lanyards equal to the depth of the water in the swimming zones; a trauma bag containing a working Automated External Defibrillator and emergency oxygen system be maintained on the property in a location where it can be promptly delivered to the scene of any emergency event in or near the water; at least one backboard with head immobilization device be kept proximate to the water for use in emergency events in or near the water; throwable flotation devices be available at all designated entry points and at least every 100 feet around the perimeter of the water; and Appellants require guests

(other than certified scuba divers equipped with scuba diving equipment) to wear appropriately-fitting U.S. Coast Guard-approved life jackets when entering the water.[5]

This appeal follows.

## II. Standard of Review

On review of a bench-tried case, we will affirm the trial court's judgment unless it is unsupported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *City of St. Louis v. Varahi, Inc.,* 39 S.W.3d 531, 535 (Mo. App. E.D. 2001); *Ivie v. Smith,* 439 S.W.3d 189, 198–99 (Mo. banc 2014); *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976). We view the evidence and inferences therefrom in the light most favorable to the trial court's judgment and disregard any evidence and inferences to the contrary. *Parkway Constr. Servs., Inc. v. Blackline LLC,* 573 S.W.3d 652, 664 (Mo. App. E.D. 2019); *Jamestowne Homeowners Ass'n Trs. v. Jackson,* 417 S.W.3d 348, 354 (Mo. App. E.D. 2013).

## III. Discussion

Appellants assert four points on appeal. As their first and fourth points on appeal are related and would be otherwise dispositive of their second and third points, we address Appellants' first and fourth points together before simultaneously addressing their second and third points, which assert the same argument respectively for Gary and Rebecca.

Points I and IV

In Appellants' first point on appeal, they argue that the trial court erred in concluding that Appellants' commercial operation of the Offsets was a public nuisance because "Missouri does not recognize a cause of action for a public nuisance where the alleged activities are solely on

---

[5] Appellants do not challenge on appeal the conditions imposed by the trial court in conjunction with its permanent injunction; we therefore do not evaluate whether the conditions ordered by the trial court are necessary to ameliorate the dangerous conditions found by the court.

9

private property and where the public has no right to enter and which enterprise does not interfer[e] with a right common to the general public." Relatedly, in their fourth point on appeal, Appellants assert that "the trial court erred in its judgment because the evidence does not support a public nuisance because nine deaths over thirty-two years is not a public nuisance."

> A public nuisance is an offense against the public order and economy of the state and violates the public's right to life, health, and the use of property, while, "at the same time annoys, injures, endangers, renders insecure, interferes with, or obstructs the rights or property of the whole community, or neighborhood, or of any considerable number of persons."

*City of Greenwood v. Martin Marietta Materials, Inc.,* 299 S.W.3d 606, 616 (Mo. App. W.D. 2009) (quoting *Varahi, Inc.,* 39 S.W.3d at 535). Missouri courts have also described public nuisance as an "unreasonable interference with a right common to the general public." *Varahi, Inc.,* 39 S.W.3d at 536; *see also City of Kansas City v. New York-Kansas Bldg. Assocs., L.P.,* 96 S.W.3d 846, 857 (Mo. App. W.D. 2002) ("In Missouri, it is well established that a public nuisance is any unreasonable interference with rights common to the public such as the public health, safety, peace, morals or convenience."); *Martin Marietta Materials, Inc.,* 299 S.W.3d at 616. Additionally, "[a]nother factor in defining a nuisance is that consideration should be given to places where the public have the legal right to go or congregate, or where they are likely to come within the sphere of its influence." *Varahi, Inc.,* 39 S.W.3d at 535 (quoting *State by Major ex rel. Hopkins v. Excelsior Powder Mfg. Co.,* 169 S.W. 267, 273 (Mo. 1914) and *State ex rel. Attorney General v. Canty,* 105 S.W. 1078, 1080–81 (Mo. 1907)); *see also New York-Kansas Bldg. Assocs., L.P.,* 96 S.W.3d at 857 ("In determining whether a public nuisance exists, the court must consider whether the alleged nuisance is located in a public place, a place where the public is likely to congregate, a place where the public has a right to go, or a place where the public is likely to come into contact with the nuisance.").

In this case, the trial court concluded that Appellants' operation of the Offsets constituted a public nuisance because the way in which Appellants operate the Offsets "interfere[s] with common community right of public safety." The court made detailed factual findings on the several deaths that occurred at the Offsets since 1989 and Appellants' unreasonable failure to warn invited members of the public of inherently dangerous conditions present on the Hensons' property and to adequately attempt to prevent or prepare for injury caused by those dangerous conditions. Thereafter, the court specifically concluded that "[t]he deaths caused and risks borne by the guests of the Offsets is against the public order of the state and endangers a considerable number of persons." We agree with the trial court's conclusions, and find that the trial court did not erroneously declare or apply the law.

Contrary to Appellants' assertion that "Missouri does not recognize a cause of action for a public nuisance where the alleged activities are solely on private property and where the public has no right to enter," abundant Missouri precedent makes clear that a public nuisance may be found where said nuisance is located at "a place where the public is likely to congregate, a place where the public has a right to go, or a place where the public is likely to come into contact with the nuisance." *New York-Kansas Bldg. Assocs., L.P.,* 96 S.W.3d at 857; *Martin Marietta Materials, Inc.,* 299 S.W.3d at 618–19; *see also Varahi, Inc.,* 39 S.W.3d at 535 (stating that a public nuisance may be found "where the public have the legal right to go or congregate, *or where they are likely to come within the sphere of its influence*") (emphasis added) (quoting *State by Major ex rel. Hopkins,* 169 S.W. at 273). Appellants' attempt to confine Missouri public nuisance law to those occurring on or affecting public property or a public road or waterway is wholly unpersuasive; while we find no Missouri case with facts directly analogous to the one at bar, "[w]hether a nuisance exists depends upon the factual circumstances of each case." *City of*

11

*Lee's Summit v. Browning,* 722 S.W.2d 114, 115–16 (Mo. App. W.D. 1986) (affirming the trial court's conclusion that appellants' use of their property as a salvage yard constituted a public nuisance because the conditions of the salvage operation were "a threat to the health, safety, and welfare of the city's residents" where salvage on the appellants' property was visible from the street adjoining the property, salvaged vehicles were parked along the street so that they interfered with passing traffic, oil from salvage leaked into the ground and ran off onto surrounding residential property during heavy rains, and the salvage operation was frequently noisy) (citing *Frank v. Envtl. Sanitation Mgmt.,* 687 S.W.2d 876, 881 (Mo. banc 1985)). Appellants' contention that no Missouri public nuisance case has addressed a factual situation similar to that present in this case is accurate. No Missouri public nuisance case has applied the law to a scenario where a private property owner invites members of the public onto his property to engage in activities involving conditions that are inherently dangerous while providing little warning, guidance, or supervision to people who are engaging in said activities and where such resulted in several deaths over the course of years. In other words, no Missouri public nuisance case has addressed a factual situation where a property owner has actually invited people to the alleged nuisance.

However, we find multiple Missouri cases finding existence of a public nuisance where said nuisance was present on private property in conjunction with a commercial enterprise and was found to interfere with the public's common right to health, welfare, and/or safety. *See Metro. St. Louis Sewer Dist. v. Zykan,* 495 S.W.2d 643, 653–54 (Mo. 1973) (affirming the trial court's conclusion that the defendant corporations' and real estate developer's failure to construct a drainage ditch channel as required by contract constituted a public nuisance because said failure resulted in an increased risk of dangerous flooding that "endanger[ed] the health and

12

welfare of an unlimited area"); *State ex rel. Renfrow v. Serv. Cushion Tube Co.,* 291 S.W. 106, 108–09 (Mo. banc 1927) (affirming the trial court's conclusion that appellants' operation of a factory that produced rubber products constituted a public nuisance because the factory emitted significant noise and vibrations that were noticeable within the surrounding three blocks and produced "offensive odors, deleterious to the health of the people in the community"); *Schnitzer v. Excelsior Powder Mfg. Co.,* 160 S.W. 282, 285–87 (Mo. App. W.D. 1912) (affirming the trial court's conclusion that appellant's storing of high quantities of blasting powder constituted a public nuisance because said practice interfered with the common community right of public safety where an explosion of the blasting powder on appellant's property injured passengers on a nearby train); *Canty,* 105 S.W. at 1083–84 (concluding that defendants' operation of a bullfight performance on private property constituted a public nuisance because said activity was "in its very nature…, both public and at the same time injurious to the public safety and good morals," and further reasoning that "a court of equity has full power and jurisdiction to abate the existing nuisance, and to perpetually enjoin the owners of the property from maintaining or conducting the same in the future"). While admittedly dated, we find the holding of *Canty*, 105 S.W. 1083–84 to be particularly persuasive, if not binding, upon the facts of this case. The Supreme Court of Missouri made clear in that case (which has not been overruled or distinguished) that use of private property to conduct and maintain activity that draws members of the public to the property, yet simultaneously interferes with the common right to safety of the members of the public who partake in that activity, may constitute a public nuisance. *Id.* And relatedly in a different respect, the Supreme Court of Missouri has held that cities may be held liable for unguarded/unsupervised bodies of water that are created or maintained by the city or that the city fails to abate because such bodies of water constitute public nuisances in that they are highly

13

attractive and inherently dangerous. *See Davoren v. Kansas City,* 273 S.W. 401, 404–05 (Mo. banc 1925) (reasoning that the defendant city was liable for damages resulting from children drowning in a pond that was created by the city's construction of a dam because "[t]he legal obligation rests upon all who create or allow such dangerous conditions to use reasonable precautions to see that no unnecessary injury shall flow therefrom to others…"); *Capp v. City of St. Louis,* 158 S.W. 616, 617–18 (Mo. 1913) (concluding that the defendant city was liable for damages resulting from children drowning in a pool located in a public park because the unguarded and unsupervised pool was an "inexcusable nuisance, which is a constant menace to the lives of the children who visit [the park]").

While the Hensons undoubtedly have private proprietary rights in regard to how they use their property, we see little reason why the combined holdings of these aforementioned cases should not be applicable to the specific facts of this case, where Appellants invite generally and open their property to members of the public. *See Canty*, 105 S.W. 1083–84; *see also Browning,* 722 S.W.2d at 115 (stating that "[w]hether a nuisance exists depends upon the factual circumstances of each case"). We find the reasoning set forth in those cases to be instructive here, as each of those cases essentially iterated that property (whether public or private) may not be used to create or maintain a dangerous condition or activity that interferes with the common rights of public health, welfare, and/or safety. We believe that this perspective is consistent with general Missouri public nuisance precedent that states a public nuisance may be found in "a place where the public is likely to congregate, … [or] a place where the public is likely to come into contact with the nuisance," *New York-Kansas Bldg. Assocs., L.P.,* 96 S.W.3d at 857 and *Martin Marietta Materials, Inc.,* 299 S.W.3d at 618–19, or where members of the public "are likely to come within the sphere of [the nuisance's] influence," *Varahi, Inc.,* 39 S.W.3d at 535.

14

Here, Appellants' entire operation of the Offsets is centered on Appellants inviting members of the general public to the Hensons' property using roadside signs and social media. Appellants invite the public onto the Hensons' property to engage in outdoor activities (relevant to this case, swimming and diving) in exchange for an admission charge. As a direct result of Appellants' invitation, members of the public congregate at the Offsets and are likely to come into contact with the nuisance at issue here and within the sphere of its influence. *See New York-Kansas Bldg. Assocs., L.P.,* 96 S.W.3d at 857; *Martin Marietta Materials, Inc.,* 299 S.W.3d at 618–19; *Varahi, Inc.,* 39 S.W.3d at 535. Undoubtedly, members of the public who enter the Hensons' property at Appellants invitation do not leave their common community rights at the door; their rights to life, health, and safety do not suddenly disappear. Additionally, during operation, the Offsets admits dozens to hundreds of people per day; thus, the interference with the common rights at issue here clearly affects a "considerable number of persons," which further supports the conclusion that Appellants' operation of the Offsets constitutes a public nuisance. *See Martin Marietta Materials, Inc.,* 299 S.W.3d at 616; *Varahi, Inc.,* 39 S.W.3d at 535. Appellants' activities in operating the Offsets—which, as found by the trial court, have resulted in the deaths of nine people since 1989—certainly affect the common community rights of the members of the public who enter the Hensons' property at Appellants' invitation. The trial court did not erroneously declare or apply the law in concluding that Appellants' operation of the Offsets was a public nuisance.

In essence, Appellants ask this Court to turn a blind eye to the several deaths of members of the public that have occurred in the course of Appellants' operation of the Offsets over the last three decades. This we will not do, especially considering the substantial evidence supporting the trial court's findings and conclusions regarding Appellants' systematic failures spanning over 30

15

years to sufficiently warn invited members of the public of inherently dangerous conditions present on the Hensons' property and to adequately attempt to prevent or prepare for injury caused by those dangerous conditions.

The exhibits (specifically, the coroner's reports) and testimony of Follis and Sheriff McCutcheon sufficiently constitutes substantial evidence supporting the trial court's factual findings on the nine deaths that have occurred in conjunction with Appellants' operation of the Offsets since 1989. And the testimony of Wood and Oostman (an expert witness), and even some of Gary's testimony and deposition, sufficiently constitutes substantial evidence supporting the trial court's factual findings on the dangerous conditions present at the Offsets and Appellants' actions/inactions to mitigate those conditions. In particular, Wood's testimony noting that he saw no staff members monitoring the water, no rescue or medical equipment near the water except for a flotation ring, and only one employee briefly after entering the property during his visit, Oostman's testimony noting the dangerous conditions and opining that the Offsets's signage and preparative and preventive measures were inadequate, and Gary's testimony detailing the bluffs surrounding the lake, stating that guests may jump from almost anywhere around the lake, and admitting that the Offsets lacked adequate warning signage as described by Oostman all support the trial court's findings. Appellants conclusively argue that "nine deaths over thirty-two years is not a public nuisance." This statement seemingly diminishes the deaths of nine people, which we find appalling, and is also somewhat inaccurate: swimming and diving at the Offsets only occurs during warm seasons (less than half of the year); in reality those nine deaths occurred over a period of time closer to 16 years. In sum, the evidence presented constitutes substantial evidence supporting the trial court's conclusion that Appellants' operation of the Offsets was a public nuisance because said operation interferes with the common community right of public safety.

16

The common right to safety, health, and life of the members of the public who have visited the Offsets has been interfered with at least nine times over the past three decades, and Appellants' failure to warn of inherently dangerous conditions and to adequately attempt to prevent or prepare for injury caused by those dangerous conditions continues to create increased risk of serious physical injury or death to those members of the public who are guests of the Offsets.

Points I and IV are denied.

Points II and III

In their second and third points on appeal, Appellants argue that the trial court erred in enjoining Rebecca (Point II) and Gary (Point III) respectively because there was no evidence in the trial record indicating that either owns or operates the Offsets (the commercial swimming and diving enterprise). Appellants' arguments asserted in these points are entirely unpersuasive.

"The issuance of injunctive relief, along with the terms and provisions thereof, rests largely with the sound discretion of the trial court." *Edmunds v. Sigma Chapter of Alpha Kappa,* 87 S.W.3d 21, 29 (Mo. App. W.D. 2002); *see also Doe v. Phillips,* 259 S.W.3d 34, 36 (Mo. App. W.D. 2008). The trial court "is vested with a broad discretionary power to shape and fashion relief to fit the particular facts, circumstances and equities of the case before it." *Burg v. Dampier,* 346 S.W.3d 343, 357 (Mo. App. W.D. 2011) (quoting *Schluemer v. Elrod,* 916 S.W.2d 371, 379 (Mo. App. S.D. 1996)).

It is uncontested that the Hensons have owned the property at which the Offsets operates since at least 1996. Additionally, Gary testified at trial that he has managed the Offsets since the early 1980's and is the sole member and manager of Offsets Recreation, which he formed in 2009. Although Appellants' primary contention is that neither Rebecca nor Gary should have

17

been enjoined in this case because they do not own or operate the Offsets,[6] Appellants'

responsive pleadings and Gary's testimony constitute substantial evidence supporting the trial

court's injunction against the Hensons. In addition to the other abundant evidence admitted at

trial, Appellants' responsive pleadings and Gary's testimony showed that the Hensons

(regardless of who was "operating" the Offsets) have allowed their property to be used since

their purchase of it in such a way that constitutes a public nuisance.

The clear purpose of the injunction issued by the trial court was to specifically prevent

operation of the Offsets swimming and diving enterprise (the public nuisance) until certain safety

and emergency measures were implemented. As owners of the property, it was logically

necessary to enjoin the Hensons from operating the Offsets personally or allowing such

operation on their property because the dangerous geographic characteristics (specifically, the

high bluffs surrounding the quarry and the quarry itself) on the Hensons' property were the

dangerous conditions at the center of this public nuisance case. The trial court's injunction

against Appellants, including the Hensons, was necessary to ensure abatement of the public

nuisance before the Hensons could use their property or allow their property to be used as a

commercial swimming and diving facility. We therefore find that there was substantial evidence

to support the trial court's injunction against both Gary and Rebecca.

Points II and III are denied.

---

[6] We note that Appellants' assertion that there was no evidence in the record that Gary "owns or operates the Offsets" is completely contradicted by Gary's own testimony at trial, wherein he confirmed that he was the sole member and manager of Offsets Recreation and had operated the Offsets since 1986.

18

## IV.     Conclusion

The trial court did not err in concluding that Appellants' operation of the Offsets, as found by the trial court, constituted a public nuisance. Nor did the trial court err in enjoining the Hensons in this case. For the foregoing reasons, the judgment of the trial court is affirmed.

_____
Colleen Dolan, Chief Judge

Robert G. Dowd, Jr., J., concurs.
Lisa P. Page, J., concurs.